UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MARY TROMBLEE,

                              Plaintiff,

        -against-                                    1:19-CV-0638 (LEK/CFH)

THE STATE OF NEW YORK, *et al.*,

                              Defendants.

---

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiff Mary Tromblee brings this action against the State of New York (the "State")

and the New York State Office for People with Developmental Disabilities (the "Agency")

(collectively, the "State Defendants"), as well as Agency employees Chad Dominie, Liam

Stander, and Alexis Barlow, asserting claims under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1983, the New York Human Rights Law, New

York Executive Law § 296 ("NYHRL"), and state common law, arising from her employment as

a nurse with the Agency. Dkt. No. 49-1 ("Amended Complaint"). Presently before the Court are

motions to dismiss filed separately by the State Defendants, Stander, and Barlow. Dkt. Nos. 56

("Barlow's Motion"); 56-1 ("Barlow's Memorandum of Law"); 57 ("Stander's Motion"); 57-1

("Stander's Memorandum of Law"); 58 ("State Defendants' Motion"); 58-3 ("State Defendants'

Memorandum of Law"). Plaintiff responded to each motion, prompting replies from each

defendant. Dkt. Nos. 61 ("Response to State Defendants' Motion"); 62 ("Response to Barlow's

Motion"); 63 ("Response to Stander's Motion"); 64 ("Stander's Reply"); 65 ("Barlow's Reply");

66 ("State Defendants' Reply"). For the reasons that follow, each motion is granted in part and

denied in part.

II.     BACKGROUND

  A.  Factual Allegations

The following factual allegations are assumed to be true. See Vega v. Hempstead Union

Free Sch. Dist., 801 F.3d 72, 76 (2d Cir. 2015).

Plaintiff began working as a nurse in the Agency's Glens Falls location in or around May

2016. Am. Compl. ¶ 28. Plaintiff was "a nurse beloved by patients at the homes where she

worked, . . . winning National Nurse's Week Recognition." Id.   ¶ 67. "Patients described

[Plaintiff] as 'a great nurse' and stated she is 'always attentive to all the individual's needs' and

that 'she always answers her phone and answers staff questions.'" Id. Plaintiff "is described as a

'very caring and compassionate person [who] goes above and beyond her job responsibilities.'"

Id.

Plaintiff was subjected to unwanted physical contact, verbal threats and insults, and other

forms of alleged sexual harassment at work, throughout a period spanning from approximately

December 2016 to October 2017, largely at the hands of her co-worker, Dominie. See id. ¶ 29.

Barlow and Stander, who at all relevant times were both employed as "Treatment Team

Leader[s]" and "Supervisor[s]," failed to remedy this harassment. See id. ¶¶ 12, 58–59, 62, 73,

75. At times, Barlow and Stander participated in the harassment. See id. ¶¶ 29, 42–43.

Additionally, throughout her term of employment with the Agency, she was subjected to various

allegedly retaliatory acts in response to her formal and informal complaints regarding workplace

misconduct by her co-workers and supervisors. See generally id.

  1. Alleged Sexual Harassment

Plaintiff's allegations of sexual harassment largely pertain to Dominie's conduct. "At all

relevant times," Dominie "is and has been employed by [the Agency] as a Keyboard

Specialist/Secretary at the Glens Falls facility[.]" Id. ¶ 11. At work, Plaintiff "sat directly in front of [Dominie], sharing a cubicle wall with him." Id. ¶ 31.

Dominie's allegedly harassing acts are numerous. In or about January 2017, Dominie "put his hand down [Plaintiff's] blouse and cupped her left breast" while she was making a phone call. Id. ¶ 32. After this event, Plaintiff informed Barlow of what had happened. See id. ¶ 33. On two other occasions, both around this same time, Dominie "tackled [Plaintiff] over the arm of a couch in the office, pinning her to the couch, so that she could not move." Id. ¶ 34. After these two incidents, Plaintiff again informed Barlow about Dominie's conduct. See id. ¶ 35.

In a meeting regarding these three incidents, at which Plaintiff, Barlow, and Dominie were present, "there was a discussion about 'boundaries.'" Id. ¶ 37. Plaintiff told Barlow "that she had previously under[gone] two back surgeries and she was afraid that she was going to get injured." Id. Dominie "agreed that he would not touch [Plaintiff] anymore." Id. Nevertheless, after a few days, Dominie's "improper conduct" resumed. See id.

In or about January or February 2017, Dominie "pulled a chair up to [Plaintiff] and stated that he liked the pants [Plaintiff] was wearing and hit [Plaintiff] on her thigh, leaving a handprint." Id. ¶ 38. "After [Plaintiff] told [Dominie] that he had hurt her by hitting her on the thigh, [Dominie] responded, 'You love it.' [Plaintiff] responded by telling [Dominie] to keep his hands off her and that he had hurt her." Id. ¶ 39. "After returning home, [Plaintiff] found that [Dominie's] act of hitting her on the thigh had left a visible bruise." Id. ¶ 40.

On three or four occasions, "beginning [in] or about January 2017," Dominie "grabbed one or both of [Plaintiff's] wrists and then twisted them," resulting in bruising. Id. ¶ 41. Annette

Abare and Michelle Bovee[1] saw what occurred and "questioned [Plaintiff] because they thought she had been injured." See id. Plaintiff replied, "this is what [Dominie] does to me." Id. (internal quotation marks and alterations omitted).

"On numerous occasions, from December 2016 through on or about October 11, 2017," Dominie and Stander "exchanged sexually explicit text messages and pictures on their cellular phones in a manner visible to" Plaintiff. Id. ¶ 42. Dominie showed these text messages and pictures to others in the office as well. See id. ¶ 43 "He[2] would bring these messages and pictures to the office and discuss them, including instances of showing a picture of a penis to [Plaintiff] and watching porn on his computer." Id. ¶ 42. Dominie "accessed sexual material using his office computer in a manner visible to [Plaintiff], and publicly shared this material with [Plaintiff] and others in the office." Id. ¶ 44. Additionally, on multiple occasions within the same time period, Dominie and Stander "engage[d] in public displays of 'dry humping' each other (i.e. simulating sexual intercourse while clothed)." Id. ¶ 42.

"On numerous occasions, from [in] or about January 2017 through on or about October 11, 2017, [Dominie] often refused to allow [Plaintiff] to utilize the light over her desk and often subjected her to verbal abuse for trying to utilize this light." Id. ¶ 45. "When [Plaintiff] would attempt to use the light, [Dominie] would say, 'I was here first, bitch, and I don't want this light on,' or words to that effect." Id. ¶ 46.

On numerous occasions within the same time period, Dominie made "explicit, suggestive, degrading, and threatening comments to [Plaintiff], including those of a sexual nature." Id. ¶ 47. He "call[ed] her names such as cunt, bitch, whore, and slut," and on one

---

[1]  Presumably, these are Plaintiff's co-workers; but Plaintiff does not specify their relationship to her.

[2]  It is not clear from the context whether "he" refers to Dominie or Stander.

occasion, told her to "'shut your whore mouth and go make me a sandwich because that's what women are good for is to be on their knees and make food for men,' or words to that effect." Id. ¶¶ 47–48. On different occasions, Dominie stated to Plaintiff, "we are going to fuck," "you have fuck me eyes," "you need a real man," and "if you see what I have, you will want to fuck me," "or words to these effects." Id. ¶ 50. On one occasion, Dominie called Plaintiff's husband a "pussy." Id. ¶ 51. On another, Dominie stated "'I was here long before you, bitch, and I'll be here long after,' or words to that effect." Id. ¶ 53.

On multiple occasions within the same time period, Dominie "ma[de] false accusations of [Plaintiff] making statements that she did not make." Id. ¶ 52.

"[In] or about February or March 2017, after [Plaintiff] complained of [Dominie's] behavior, [Dominie] placed a fake rat on [Plaintiff's] desk and then called [Plaintiff] a 'nark and a rat.'" Id. ¶ 55.

Plaintiff also alleges varied conduct by Dominie occurring specifically in last few months of the January-October 2017 period. On three or four occasions "[in] or about June and July 2017," Dominie "flung hand sanitizer at [Plaintiff], often putting the sanitizer into her hair." Id. ¶ 70. In or about July 2017, Dominie "lifted [Plaintiff's] shirt up and over her head and held it around [Plaintiff's] neck and the top of her head, leaving her torso completely exposed." Id. ¶ 69. On two other occasions around July 2017, Dominie "lifted [Plaintiff's] dress so he could see her underwear." Id. ¶ 72. In another instance around the same time, Dominie "walked into the entrance of [Plaintiff's] cubicle and would not let her out. He then unzipped his pants and exposed himself to [Plaintiff] at her work station." Id. ¶ 71.

"On or about October 11, 2017," after Dominie returned from a brief medical leave, Dominie "shoved [Plaintiff] into a chair, straddled her legs, held her hands over her head[,] and

threatened to rape her, stating, 'If you aren't going to fucking give me what I want, I am going to take it,' or words to that effect." Id. ¶ 76. Plaintiff "screamed for help, causing [Dominie] to end his assault and battery." Id. After the October 11, 2017 assault, "Ms. Tammy Madison," who had witnessed the assault, "immediately . . . reported what had happened[.]" See id. ¶ 77.  On October 16, 2017, Plaintiff herself "reported the attack to [Barlow,] who stated in response, 'I can't believe he's only been back three days [from medical leave], and he's already in trouble again." Id. ¶ 78. Barlow also, on the same day, told Dominie that "there will be no name calling, no rats on her desk, and no calling her a rat." Id. ¶ 80. Stander, for his part, remarked on the same day, in reference to the October 11, 2017 assault, that "we all have taken part in fooling around, and we all hold some blame." Id. ¶ 79.

For an unspecified amount of time during the January 2017-October 2017 period, Plaintiff "was forced to cease working at her main . . . work station during the day . . . as a result of the continued and unaddressed sexual harassment by [Dominie] and was forced to primarily work out of individual homes . . . in which she conducted patient visits." Id. ¶ 56. Plaintiff would instead complete work at her "main . . .work station . . . after normal business hours, in order to avoid [Dominie] and [Stander] and the severe and pervasive sexually charged hostile work environment [Barlow] and [Stander] permitted to permeate the office." Id. ¶ 58. Plaintiff was "forced to be isolated from her work station, from other nurses and employees, and forced to work extra hours and file paperwork after hours because of her fear of the sexual harassment instigated by" Dominie. Id. ¶ 57.

In late October or November 2017, Plaintiff "was forced to transfer to an alternate position due to the continuing, and unremedied, severe and pervasive harassment experienced at the Glens Falls office to a position located at" the Agency's location in Corinth, New York. Id. ¶

85. "As a result of the transfer, [Plaintiff] was forced to accept a distinct patient load and learn a separate and distinct set of mental and physical conditions suffered by her new patients." Id. ¶ 88.

Despite being aware of Dominie's conduct, Barlow and Stander generally "failed to sufficiently act to remedy [Dominie's] discrimination and harassment." See id. ¶ 57. In characterizing the Agency's general response to Dominie's conduct, Plaintiff alleges that "the Agency responded at times by taking no action at all, and at other times by merely inadequately verbally discussing the issues with" Dominie. Id. ¶ 68.

In addition to informing Barlow in or around January 2017 of incidents in which Dominie touched Plaintiff's breast without consent and tackled her, see id. ¶¶ 33, 35, and informing Barlow and Stander of the October 11, 2017 assault, see id. ¶ 78, between January and October 2017, Plaintiff "made additional reports to [Barlow] regarding every instance of inappropriate behavior" by Dominie, see id. ¶ 61. On "at least" three or four occasions between July 2017 and October 2017, Barlow "responded to [Plaintiff's] complaints against [Dominie] by telling [Plaintiff] that [she] was blameworthy for [Dominie's] discrimination and harassment because [she] wore dresses and sometimes spoke to [Dominie]." Id. ¶ 73. In "mid to late October 2017," Plaintiff "asked [Barlow] why [she] was unwilling to take appropriate remedial action against [Dominie]," to which Barlow responded, "'I do not care about you. I care about my job,' or words to that effect." Id. ¶ 81. Barlow also witnessed some of Dominie's conduct toward Plaintiff. For instance, Barlow "witnessed [Dominie] push [Plaintiff] on a couch on one occasion but chose not to intervene," instead stating "'Stop picking on poor Mary' and 'Mary's going to tell me again' in a demeaning and joking manner." See id. ¶ 62. Barlow additionally witnessed

Dominie engage in other "sexually inappropriate behavior" and make other "sexually inappropriate statements." See id.

Plaintiff alleges that Barlow and Stander were aware of Dominie's conduct from sources aside from Plaintiff as well. In or about February 2017, Steve Cernak, an Agency information technology staff member, "sent an email to Stander regarding" Dominie's aforementioned "shut your whore mouth and make me a sandwich" comment. Id. ¶¶ 60, 126. Plaintiff alleges, generally, that Barlow and Stander were aware of Dominie's "sexually inappropriate actions and harassment" toward other women at the Agency, but similarly failed to "address" that conduct. Id. ¶ 64.[3] On a specific occasion "[in] or about early October of 2017," during Dominie's medical leave, Plaintiff, "accompanied by other employees in the same office, approached [Barlow] and stated that they were uncomfortable about him returning from medical leave and coming back to the office." Id. ¶ 74. At this meeting, Barlow "responded by stating 'one of you is playing into this,' and told the women that there was nothing she could do." Id. ¶ 75. Further, Plaintiff notes that it was generally known that Dominie had at some point in the past been reassigned "from a direct assistant to a position as a keyboard specialist/secretary" due to workplace misconduct. See id. ¶ 63.

"In or about October 2017, [Plaintiff] was mistakenly included on an internal e-mail between Dr. Paul Byron, Laura LaValley and James Doddemeade, all high level employees at [the Agency,] in which Ms. LaValley, a supervisor at [the Agency,] stated that in addition to

_____

[3] Plaintiff alleges that Dominie acknowledged in an interview with the Associated Press on March 1, 2019 "that he engaged in 'locker room' behavior that included calling female co-workes 'whores,' providing marijuana to supervisors and viewing pornography in the office." Id. ¶ 112. Plaintiff also alleges that "other women interviewed by the [Associated Press] provided information related to the harassment at [Dominie's] hands." Id. ¶ 115.

concerns about changing locks at the [Agency,] she would be addressing 'inaction by TTL,'" a reference to "the Treatment Team Leader, [Barlow]." Id. ¶ 86.

### 2. Alleged Retaliation

Separately from Plaintiff's sexual harassment allegations, she presents a narrative of alleged retaliation by Defendants throughout a time period overlapping with and extending beyond the January-October 2017 period of sexual harassment. She describes this alleged campaign of harassment as "ongoing and continuous as a direct result of her disclosure of discriminatory conduct." Id. ¶ 105.

Apart from her continual informal, oral complaints between January and October 2017 regarding Dominie, Plaintiff also allegedly opposed workplace harassment by more formal means. For instance, on October 19, 2017, Plaintiff "filed a formal complaint against [Dominie] alleging the facts" of the October 11, 2017 assault. See id. ¶ 82. On May 24, 2018, Plaintiff's complaint was found to be substantiated. See id. ¶ 97, Ex. C. And on October 25, 2017, Plaintiff "filed criminal charges and a supporting deposition against [Dominie] at the Glens Falls Police Department." Id. ¶ 83. Dominie was arrested based on charges stemming from the October 11, 2017 assault on November 28, 2017. See id. ¶ 91. Plaintiff filed a supplemental criminal deposition regarding the same charges on January 3, 2018. See id. ¶ 93. On April 6, 2018, Dominie pled guilty to a criminal harassment charge in Glens Falls City Court. See id. ¶ 94. On April 16, 2018, Plaintiff was issued an order of protection against Dominie. See id. ¶ 95.[4]

---

[4]  Around October 27, 2017, Dominie filed an internal complaint for sexual harassment against Plaintiff and others "in retaliation for [Plaintiff] disclosing [Dominie's] sexual harassment." Id. ¶ 84. Dominie's internal complaint was found unsubstantiated on May 24, 2018. See id. ¶ 98.

Plaintiff alleges a series of retaliatory acts spanning from prior to October 2017 to as late as July 2019. "From an unknown time through the present," Plaintiff "has been excluded by [Stander] from critical communications regarding vulnerable (disabled) individuals for whom she is responsible." Id. ¶ 65. "Upon information and belief, this treatment is . . . part of a campaign to set [Plaintiff] up for failure, discipline, and/or removal from the Agency." Id. ¶ 66. Separately, "[f]rom [in] or about November 2017 through the present, [Plaintiff's] timecards, . . . which management is responsible for signing, have not been signed in a timely manner, thereby impacting [Plaintiff's] compensation." Id. ¶ 89. This occurred in connection with at least seven different pay periods, on at least ten occasions. See id. ¶ 102.

During a period spanning from roughly December 2017 to the present, Barlow on multiple occasions "attempted to solicit statements that [Plaintiff] had been discussing her complaints and/or cases," see id. ¶ 87, and "needlessly and inappropriately discussed [Plaintiff's] complaints and cases with others," id. ¶ 92. In one instance, Barlow asked Sheila Rowland, Plaintiff's co-worker, "whether [Plaintiff] made any comments about any of her complaints" and told Rowland "to report [Plaintiff] to the Agency if she makes any such statements." See id. Additionally, "[o]n or about November 9, 2017 and November 27, 2017, [Agency] employee Ms. Michelle Russo threatened [Plaintiff] with discipline for allegedly speaking about her sexual harassment complaint, even though [Plaintiff] had not spoken about her complaint(s) in any prohibited manner." Id. ¶ 90.

In the fall of 2018, Plaintiff "attended a fire safety training in which [Barlow] and Mr. Dale Stone, a close friend of [Dominie], came in and sat directly behind [Plaintiff], even though other seats were available, to further intimidate [Plaintiff]." Id. ¶ 106. Plaintiff "felt targeted by this behavior in retaliation for disclosing the misconduct of [Dominie]." Id.

From "on or about April 2018 through late July 2018, the Agency prevented Plaintiff from competing for the position of Registered Nurse for its Corinth, New York Adirondack clinic by refusing to make this vacant position available after learning that [Plaintiff] was interested in filling it, in reprisal for complaining about" Dominie's conduct. Id. ¶ 96. At some time in May or June 2018, "Dr. Byron stated that there would be a position opening in the Adirondack clinic, but they would not be posting the position because they 'would get someone they don't want,' or words to that effect." Id. ¶ 99. He also stated, around the same time, "'I hope the next person that files a sexual harassment claim isn't having a relationship with them,' or words to that effect." See id. ¶ 100. Plaintiff ultimately was granted a position at the Adirondack clinic.[5]

On June 14, 2018, Plaintiff "disclosed" to "Ms. Sheehan," "Amy Link," and "Mr. Doddemeade" allegations that Plaintiff's supervisors had failed on multiple occasions to promptly sign pay cards, in retaliation for her prior complaints of discrimination regarding Dominie's conduct. See id. ¶ 102. At the same time, she also reported other "retaliatory behavior of, but not limited to" Dr. Byron, Russo, Barlow and Stander. See id. ¶ 103. On July 11, 2018, Plaintiff filed a formal internal complaint regarding her supervisors' allegedly retaliatory delays in signing her pay cards. See id. ¶ 104.

---

[5]  Plaintiff alleges that in the spring of 2018, after Plaintiff was granted a position at the Adirondack clinic, Dr. Byron stated, "'We created sexual harassment here at the state, I voted for it,' or words to this effect, in the presence of Plaintiff and other personnel at the Adirondack clinic[.]" See id. ¶ 107. The context suggests that Plaintiff means to refer to the spring of 2019, as she earlier alleges that she was prevented from applying for this position during the spring of 2018. See id. ¶ 96. Plaintiff alleges "discriminatory and/or retaliatory non-selection for this position." Id. ¶ 101. At this stage, absent clarification regarding the dates on which she applied for the position and was denied appointment, respectively, the Court does not assess whether any alleged delay in her appointment supports her discrimination or retaliation claims.

In February 2019, the Agency "set up a sham interrogation, for March 5th, into an issue that [Plaintiff] was not involved in[.]" Id. ¶ 110. "Ms. Erika Valenti, a long-time friend of [Dominie], was to be the investigator in the sham interrogation." Id. Plaintiff, "upon notice of the interrogation, immediately responded concerning Ms. Valenti's relationship with [Dominie] and explained that the issue involved in the investigation had nothing to do with her nursing duties." Id. The Agency "eventually removed Ms. Valenti as the investigator upon [Plaintiff's] request." Id.

Plaintiff further alleges that she was compelled to testify at "disciplinary proceedings"[6] against Dominie, "causing her additional mental anguish and stress." See id. ¶ 119. On or about February 11, 2019, Plaintiff "was notified that her testimony was requested" for these proceedings. See id. On or about February 21, 2019, "Mr. David Albano, an investigator for [the Agency], was informed that [Plaintiff] suffered from ongoing mental anguish and stress as a result of [Dominie's] actions, and that testimony during the disciplinary hearing without legal counsel or security protection was improper." Id. ¶ 121. "This request received no response or acknowledgment." Id. On or about March 2019, "the Governor's Office of Employee Relations was informed of the February 21, 2019 disclosure made to Mr. David Albano regarding [Plaintiff's] opposition to testify[ing] at [Dominie's] disciplinary hearing." Id. ¶ 122. On or about March 25, 2019, "Linda Ronda, Disciplinary Panel Administrator, was informed of communications concerning the disciplinary hearing, the February and March letters to Mr. Albano and the Governor's Office of Employee Relations[,] and [a] request[] [for] a subpoena for [Plaintiff's] testimony." Id. ¶ 123.

---

[6] Plaintiff also refers to these proceedings as "arbitration" proceedings. See id. ¶ 120.

On or about March 28, 2019, "Eileen Haynes, Deputy Counsel for [the Agency] issued a subpoena duces [tecum] to [Plaintiff] to testify at proceedings against [Dominie]" on April 29, 2019. Id. ¶ 124. "Multiple times," Mr. Albano "threatened [Plaintiff's] job if she did not assist NYS with terminating [Dominie]." Id. ¶ 125. Mr. Albano's actions "left [Plaintiff] at risk for a stroke with elevated blood pressure." See id. Mr. Albano "forced [Plaintiff] to participate" in multiple "preparation sessions," "despite her informing him of the impact on her health, to prepare testimony against [Dominie]. She was forced to relive the events again in agonizing detail." Id. ¶ 126. In one of these preparation sessions, Mr. Albano referenced several comments Dominie had uttered to Plaintiff, including "shut your whore mouth and go make me a sandwich," "Mary likes to get fucked up the ass," and "she likes it when men cum on her face." See id.

The Agency denied Plaintiff's requests to testify on April 29, 2019 in a separate room from Dominie. See id. ¶ 127. The Agency denied multiple such requests "despite the Order of Protection and the security concerns that [Plaintiff] expressed in writing and verbally about her own safety and [Dominie's] mental instability and unpredictability." Id. The subpoena and the internal investigation process "caused [Plaintiff] to re-experience the original trauma again and again as a result of [Dominie's] actions." See id. ¶ 128.

Plaintiff alleges that in compelling her to participate in the hearing and pre-hearing investigation in this manner, and threatening her with termination if she did not, the Agency retaliated against her for prior complaints of discrimination and retaliation. See id. ¶¶ 120, 129.

On an unspecified date, Cynthia Holt, a nursing supervisor with the Agency, informed Plaintiff that Agency "management" had told Holt that Plaintiff "was having an affair with" Dominie. See id. ¶ 137.

Additionally, Plaintiff alleges that the Agency, "in a continuous concerted campaign of retaliation and hostile work environment retaliation, targeted [Plaintiff's] closest family members, her daughters and her sister," who all work for the Agency. Id. ¶ 130.

Aubrey,[7] Plaintiff's daughter, at one time worked "at the Spier Falls IRA," an Agency "group home." See id. ¶ 144. On June 28, 2018, Aubrey "put in her notice of resignation and left the Agency." Id. On or about July 27, 2018, "she reapplied and asked to return to her previous position." Id. "The Collective Bargaining Agreement with [the Agency] provides that an employee who leaves in good standing is permitted to return to a position with New York State within one year by notifying the office of personnel and submitting an application." Id. ¶ 145. "Despite her trainings being up to date, only being gone for four weeks, being in good standing when she left, and [the Agency] having approximately 288 positions available and paying overtime frequently to current employees, Aubrey was not permitted to return to" work at the Agency. Id. ¶ 147. Aubrey applied two more times for her position, in August and September 2018, respectively, without success. See id. ¶¶ 148–49. On the third occasion, Aubrey "took her application to the office directly, and the person working at the office looked Aubrey up in the computer and told her there was no sense in putting the third application in." Id. ¶ 149. Aubrey later attempted to file more applications. See id. ¶ 150. She called the Agency's personnel office to follow up on the status of these later applications, but no one returned her calls, and she was ultimately informed that the Agency had lost all of her later applications. See id. ¶ 151.

Amanda Tromblee, Plaintiff's other daughter, is employed by the Agency as a "Habilitation Specialist 1." Id. ¶ 131. "During Amanda's mandatory sexual harassment, mindfulness and on the job training sessions between late March [and] mid-April 2019, several

---

[7] Plaintiff does not specify Aubrey's last name.

comments were made by instructors, which Amanda witnessed, in which they alluded to [Plaintiff's] sexual harassment matter[]." Id. ¶ 131. Prior to these training sessions, an article had been published in the news concerning the harassment Plaintiff and other women had experienced at the Agency. See id. ¶ 132. "Upon information and belief, the instructors made these statements without knowledge that Amanda . . . was in attendance at the training[.]" Id.

During "mindfulness" training, "Jim Maier, an instructor, made statements critical of reports of sexual harassment as related to the news story and commented how people 'believe what they want to' and further stated 'it's like when you see a news report about something happening halfway across the country, you believe it, until you see a story in the paper where you know all the parties,' and 'realize that almost none of it is true' or words to that effect." Id. ¶ 132 (alterations omitted). "Later in the training," Amanda informed Maier of her relationship to Plaintiff, after which Maier "had a very surprised look on his face." See id. ¶ 134.

On or about July 12, 2019, Amanda's supervisor, Tarrene Whitcomb, "informed her that as of July 14, [Barlow] . . . would be covering as Amanda's supervisor." See id. ¶ 139. Plaintiff alleges that this personnel change was "another act to intimidate [Plaintiff] through her daughter." See id.

On or about July 16, 2019, "Amanda inquired about this retaliatory action via email." Id. ¶ 140. "Her supervisor dismissed her concern," informing Amanda "that [Barlow's] appointment as her supervisor had nothing to do with her" and that Barlow was only covering 'temporarily'" Id. ¶¶ 140–41. On or about July 15, 2019, Amanda was notified that Barlow would be in attendance at a meeting regarding one of Amanda's clients. See id. ¶ 142. Whitcomb "excluded Amanda from the meeting . . . due to [Barlow's] involvement in the meeting[.]" See id. The

location of the meeting was ultimately changed, and Whitcomb "made a misrepresentation to Amanda that the meeting was not happening." See id.

Plaintiff further alleges that her sister, Marcia Marcotte, was "targeted." See id. ¶ 152.[8] On or about March 15, 2019, after "her regular 3:00 p.m. – 11:00 p.m. shift at the Greenfield House in Greenfield, NY," Marcotte "was instructed to work at Saratoga Hospital to sit with a patient . . . from 11:00 p.m. – 7:00 a.m." Id. At the time of this second shift, Marcotte "did not have 'alone status' and, as such, should not have been permitted to be with the [patient] without another staff member present." Id. ¶ 153.

"During this shift, a staff nurse accused Ms. Marcotte of having closed her eyes while watching the [patient.] Ms. Marcotte adamantly denied this allegation. She advised the supervisor of the same, stating that given that the lights are low during this sitting shift, when the light was turned on by a nurse she was startled." Id. ¶ 154. The Agency subsequently "threaten[ed] to place Ms. Marcotte on an abuse registry." Id. ¶ 155 (emphasis omitted). Plaintiff alleges that the accusation against Marcotte was false, and that her placement on the "abuse registry" would have been improper in any case, as she was not "responsible for care" during the shift in question. See id.

Marcotte was terminated on July 3, 2019. See id. ¶ 157. Plaintiff notes that Marcotte was terminated approximately six weeks after Plaintiff filed her initial complaint in this action, on May 29, 2019. See id. ¶ 158. Plaintiff avers that Marcotte's termination, based on "allegations without merit," was in retaliation for the filing of that complaint. See id.

On July 31, 2019, Albano informed Plaintiff by e-mail that Dominie had been "ordered . . . back to work with a suspension to date." See id. ¶ 161 (internal quotation marks omitted).

---

[8] Plaintiff does not specify Marcotte's title.

On August 12, 2019, Plaintiff filed an internal complaint with the Agency concerning the alleged retaliation detailed above. See id. ¶ 164. Without meeting with Plaintiff or any other witnesses, the Agency determined that her complaint was not substantiated. See id. ¶ 165.

### B.  Procedural History

All defendants other than Dominie move to dismiss pursuant to Federal Rule of Civil Procedure 12(b). The State Defendants move to dismiss Plaintiff's § 1983 claim, NYHRL claim, and negligence claim, but not her Title VII discrimination claim. See generally State Defs.' Mem. of Law. The State Defendants additionally request that the Court dismiss certain aspects of Plaintiff's Title VII retaliation claim. See id. at 11–19. Barlow and Stander move to dismiss all claims against them. See generally Barlow's Mem. of Law; Stander's Mem. of Law.

In her Responses to Defendants' Motions, Plaintiff withdraws certain claims. See Resp. to State Defs.' Mot. at 2; Resp. to Barlow's Mot. at 1; Resp. to Stander's Mot. at 1. Subsequent to these withdrawals, Plaintiff asserts the following claims: (1) Title VII discrimination and retaliation claims against the State Defendants; (2) NYHRL discrimination and retaliation claims against Barlow and Stander; and (3) § 1983 claims against Barlow and Stander.

## III.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Fed. R. Civ. P. 12(b)(6). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to

state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. Plausibility

requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of

[the alleged misconduct]." <u>Id.</u> at 556. The plausibility standard "asks for more than a sheer

possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678 (citing <u>Twombly</u>, 550

U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual

allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." <u>Id.</u> (citing <u>Twombly</u>, 550 U.S. at 555). Where a court is unable to infer more than

the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not

demonstrated that she is entitled to relief and the action is subject to dismissal. <u>See id.</u> at 678–79.

## IV.    DISCUSSION

Below, the Court addresses, in order, Plaintiff's Title VII, NYHRL, and §1983 claims.

### A.  Title VII

#### *1. Hostile Work Environment*

Plaintiff alleges that she was subjected to a hostile work environment on the basis of her

sex. The State Defendants have not moved to dismiss this claim. Nevertheless, since Plaintiff's

allegations of sexual harassment provide necessary context for her other claims, the Court briefly

discusses the factual and legal bases for her Title VII hostile work environment claim. Her

allegations far exceed legal sufficiency.

To establish a hostile work environment claim under Title VII, "a plaintiff must allege

facts to plausibly 'show that the workplace is permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe and pervasive to alter conditions of the victim's

employment and create an abusive work environment.'" <u>Erno v. N.Y. State Office of Info. Tech.</u>

Servs., No. 19-CV-1457, 2020 WL 2736563, at *7 (N.D.N.Y. May 26, 2020) (quoting Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010)).

Plaintiff alleges that over a period of at least a year, her co-worker Dominie repeatedly sexually assaulted her, accosted her with sexist slurs and other demeaning language, forced her to view pornography, and engaged in simulated sex acts in front of her, among other affronts. If even some of these allegations are proven, the State Defendants will be held liable for hostile work environment harassment. See, e.g., Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2d Cir. 1995) ("[E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability."); Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007) ("[T]he mere presence of pornography in a workplace can alter the status of women therein and is relevant to assessing the objective hostility of the environment.") (internal quotation marks omitted).

The State Defendants are liable for this harassment, because supervisory employees, including Barlow and Stander, were continually informed of Dominie's conduct, by Plaintiff and others, but did little to redress it. See, e.g., See Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996) ("The harassment which led to the hostile work environment was attributable to a co-worker . . . . Van Zant, therefore, must demonstrate that KLM either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.") (internal quotation marks omitted); Williams v. City of New York, No. 99-CV-2697, 2006 WL 2668211, at *18 (E.D.N.Y. Sept. 11, 2006) (denying summary judgment based on evidence that the plaintiff was subjected to sexual assault, demeaning comments, and other "behaviors designed to make plaintiff feel uncomfortable" by a co-worker over a two-to-three year period and that her supervisors failed to intervene).

### 2. *Retaliation*

Plaintiff asserts, in a single count, a claim for "retaliation and retaliatory hostile work environment." See Am. Compl. ¶¶ 184–96.

#### a. Standards

For a retaliation claim to survive a motion to dismiss, a plaintiff must plausibly allege (1) "participation in a protected activity known to the defendant"; (2) "an employment action disadvantaging the plaintiff"; and (3) "a causal connection between the protected activity and the adverse employment action." Feingold v. New York, 336 F.3d 138, 156 (2d Cir. 2004) (internal quotation marks omitted); see also 42 U.S.C. § 2000e-3(a). "[C]ourts have recognized claims of retaliation in which the underlying adverse employment action is the creation of a hostile work environment." Dixon v. City of New York, No. 03-CV-343, 2008 WL 4453201, at *18 (E.D.N.Y. Sept. 30, 2008) (collecting cases), on reconsideration, No. 03-CV-343, 2009 WL 1117478 (E.D.N.Y. Apr. 24, 2009). "The showing required for a retaliatory hostile work environment is similar to a gender-based hostile work environment claim, except that the disparate treatment must be motivated not by discrimination based on plaintiff's membership in a protected group, but by retaliation for plaintiff's having engaged in a protected activity." Davis v. City of New York, No. 09-CV-669, 2010 WL 3895578, at *3 (S.D.N.Y. Oct. 5, 2010) (alteration omitted) (citing Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 116 (2d Cir. 2000)).

#### b. Nature of the Claim

As an initial clarifying matter, Plaintiff necessarily asserts a single Title VII retaliation claim, brought on two alternative theories, as opposed to two separate retaliation claims. See, e.g., Dapson v. City of Rochester, New York, No. 17-CV-6704, 2019 WL 591692, at *12

(W.D.N.Y. Feb. 12, 2019) ("[T]he alleged retaliatory hostile work environment does not create two separate claims . . . but, rather, the retaliatory hostile environment, if established, is an element of a retaliation claim."). More precisely, a retaliatory hostile work environment constitutes an adverse action, for purposes of a retaliation claim. See id. Alternatively, and more conventionally, Plaintiff can establish a retaliation claim based on a discrete act by her employer that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).

The State Defendants make an unusual request—that the Court dismiss Plaintiff's retaliation claim only insofar as it is predicated on a retaliatory hostile work environment or on certain discrete retaliatory acts that Defendants argue are not materially adverse. See Defs.' Mem. of Law at 11–19. By the State Defendants' framing, they do not move to dismiss Plaintiff's retaliation claim as a whole. See id. at 11 ("The material adversity requirement weeds out many of the Plaintiff's jumble of allegations of retaliation"); State Defs.' Reply at 2 (noting that "certain specific allegations cannot serve as the basis for her retaliation claim"). This is not a cognizable request.

Under Federal Rule of Civil Procedure 8, a plaintiff "may set out 2 or more statements of a claim . . . alternatively or hypothetically, either in a single count . . . or in separate ones" and "the pleading is sufficient if any one of them is sufficient." Fed. R. Civ. P. 8(d)(2). "The word claim denotes 'the aggregate of operative facts which give rise to a right enforceable in the courts.'" Gottesman v. Gen. Motors Corp., 401 F.2d 510, 512 (2d Cir. 1968) (quoting Original Ballet Russe v. Ballet Theatre, 133 F.2d 187, 189 (2d Cir. 1943)). "A cause of action that is based on one set of facts but that contains multiple, alternative legal theories supporting relief is

still just one 'claim.'" <u>In re Am. Express Anti-Steering Rules Antitrust Litig.</u>, 343 F. Supp. 3d 94, 100 (E.D.N.Y. 2018).

Plaintiff alleges a single set of facts relevant to the "adverse action" element of her retaliation claim. Namely, she alleges that over a period spanning from the beginning of her employment to roughly July 2019, supervisory employees took a series of harmful actions against her that she contends were in retaliation for her continual complaints of discrimination throughout the same period. The "adverse action" element of her retaliation claim is composed of many parts, in the sense that it incorporates numerous alleged retaliatory acts. The claim also incorporates two theories with respect to this element—one according to which each alleged instance of retaliation is a discrete, materially adverse action, and one according to which the sum total is materially adverse.

The State Defendants filed a motion to dismiss *claims*. <u>See</u> Fed. R. Civ. P. 12(b)(6) (providing that a party may assert a defense of "failure to state a *claim* upon which relief can be granted") (emphasis added). The State Defendants thus must establish the legal insufficiency of the retaliation claim as a whole, by undermining at least one element. They cannot move to dismiss one of two adverse action theories, or specific allegations relevant to the adverse action element. <u>See</u> <u>In re Am. Express Anti-Steering Rules Antitrust Litig.</u>, 343 F. Supp. 3d at 101 ("As the Second Circuit has long held, 'part only of a single claim cannot be adjudicated with finality.'") (quoting <u>Rieser v. Baltimore & Ohio R.R. Co.</u>, 224 F.2d 198, 204 (2d Cir. 1955)); <u>see also</u> <u>BBL, Inc. v. City of Angola</u>, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.") (emphasis in original).

The State Defendants highlight case law that they say exemplifies their proposed approach. See State Defs.' Reply at 304 (citing Lehman v. Bergmann Associates, 11 F.Supp.3d 408, 415–18 (W.D.N.Y. 2014) (denying a motion to dismiss a retaliation claim predicated on multiple adverse actions, while holding that certain alleged adverse actions were not materially adverse); Lebowitz v. NYC Dep't of Education, 407 F. Supp. 3d 158, 171–72 (E.D.N.Y. 2017) (denying a motion to dismiss a disparate treatment claim, while holding that certain alleged employment actions were not materially adverse)). In these cases, courts addressed the materiality of alleged adverse employment actions one at a time, as this Court would under the State Defendants' preferred method. But the defendants in both cases moved, properly, to dismiss entire retaliation claims. Each court, perhaps for the sake of thoroughness, addressed all alleged adverse actions. Cf. Pollack v. Reg'l School Unit 75, 12 F. Supp. 3d 173, 189 (D. Me. 2014) ("Because the Plaintiffs' . . . retaliation claim survives under at least one of the adverse actions [pleaded in the complaint], the Court need not determine whether the other adverse actions alleged would also support their claim."). But neither court entertained a narrow request to disqualify specific alleged adverse actions from consideration in later stages of litigation. Moreover, because the plaintiffs in Lehman and Lebowitz did not allege alternative hostile work environment theories, these cases could not support State Defendants' assertion that the Court can adjudicate a motion to dismiss just one of two theories.

In this case, if Plaintiff succeeds on a hostile work environment theory of retaliation, the Court need not address any basis for dismissal that is fatal only to a conventional adverse action theory. See Johnson v. City of New York, No. 16-CV-6426, 2018 U.S. Dist. LEXIS 55424, at *52 (E.D.N.Y. Mar. 31, 2018) ("[T]he complaint sufficiently alleges that Lemonda was not acting under color of state law when he disclosed plaintiff's private and confidential information

to the *New York Post*, and it is of no moment that the complaint also pleads alternative theories[.]"); Croixland Properties Ltd. P'ship v. Corcoran, 174 F.3d 213, 218 (D.C. Cir. 1999) ("Under Federal Rule of Civil Procedure 8[(d)(2)], a complaint may contain alternative theories, and if one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint."); Elena v. Municipality of San Juan, 677 F.3d 1, 8 (1st Cir. 2012) ("[T]he rules are clear that alternative pleadings are proper, and the plaintiffs appear to have presented at least one set of facts sufficient to support a plausible property interest in the tree that forms the centerpiece of this litigation.") (internal citation omitted).

For the reasons that follow, Plaintiff adequately alleges a retaliation claim against the State Defendants based on a hostile work environment theory of adverse action. The Court addresses the State Defendants' arguments pertaining to the sufficiency of Plaintiff's claim based on a hostile work environment theory; and the Court acknowledges the State Defendants' arguments regarding specific alleged retaliatory acts only insofar as these arguments bear on the viability of Plaintiff's retaliation claim.

### c.   Legal Sufficiency

Plaintiff alleges that she engaged in numerous instances of protected conduct over the time period covered by the Amended Complaint, through formal and informal complaints, both internally, at the Agency, and externally, in criminal and civil forums. See Dhar v. City of New York, 655 Fed. App'x. 864, 865–66 (2d Cir. 2016) (affirming that filing a complaint in federal court is a protected activity); McCarthy v. Brennan, No. 19-CV-1386, 2020 WL 5549072, at *7 (N.D.N.Y. Sept. 16, 2020) ("[A] direct report to law enforcement can qualify as protected activity if the police complaint pertains to improper behavior that is part and parcel of the discriminatory conduct of which the plaintiff complains.") (citing Labonia v. Doran Assocs.,

LLC, No. 01-CV-2399, 2004 WL 1921005, at *10 (D. Conn. Aug. 25, 2004)); Summa v. Hofstra

Univ., 708 F.3d 115, 125–26 (2d Cir. 2013) (holding that Plaintiff's written complaints to an

officer of the employer were protected); Sumner v. United States Postal Service, 899 F.2d 203,

209 (2d Cir. 1990) ("In addition to protecting the filing of formal charges of discrimination,

[Title VII] protects as well informal protests of discriminatory employment practices, including

making complaints to management . . .").

     The timeline of Plaintiff's protected complaints is as follows. Between January and

October 2017, Plaintiff continually made informal complaints to Barlow and Stander regarding

Dominie's conduct. See Am. Compl. ¶¶ 33, 35, 61, 78. On October 19, 2017, Plaintiff filed a

formal internal complaint regarding an incident of assault. See id. ¶ 82. On October 25, 2017,

Plaintiff filed criminal charges against Dominie. See id. ¶ 83. On November 28, 2017 Dominie

was arrested based on Plaintiff's criminal allegations. See id. ¶ 91. On May 24, 2018, Plaintiff's

October 19, 2017 complaint was found to be substantiated. See id. ¶ 97. On June 14, 2018,

Plaintiff complained to Sheehan, Link, and Doddemeade about her supervisors' allegedly

retaliatory delay in signing pay cards and other retaliatory conduct. See id. ¶¶ 102–103. On July

11, 2018, Plaintiff filed a formal internal complaint regarding the alleged pay card retaliation.

See id. ¶ 104. On May 29, 2019, Plaintiff filed her initial complaint in this action. Docket.

     Plaintiff appears to present two interwoven causation narratives. The first is that she

continually complained of discrimination and was in reaction continually burdened by

supervisors with certain patterns of slights. For instance, Plaintiff alleges that throughout much

of the relevant time period, Stander excluded her "from critical communications regarding

vulnerable (disabled) individuals for whom she is responsible." Id. ¶ 65.[9] And from November

---

    [9] Plaintiff's failure to allege precise dates for these meetings does not run afoul of Fed R.
Civ. P. 8 in this instance, given that she has specified the actor responsible and that her theory

2017 onwards, supervisors repeatedly failed to sign her timecards in a timely manner, "thereby impacting [Plaintiff's] compensation." Id. ¶ 89. Both types of slights, considered in the aggregate, and alongside other negative employment actions, could be components of a retaliatory hostile work environment. See Spence v. Bukofzer, No. 15-CV-6167, 2017 WL 1194478, at *8 (S.D.N.Y. Mar. 30, 2017) (finding sufficiently severe or pervasive conduct for purposes of a hostile work environment discrimination claim based on, inter alia, exclusion from a meeting);[10] Hinton v. Alabama State Univ., No. 18-CV-994, 2020 WL 6946449, at *8 (M.D. Ala. Nov. 25, 2020) (finding a "mosaic" of discrimination based in part on evidence that the defendant had twice delayed plaintiff's paycheck). And an inference of causation is plausible under the circumstances, given both the general coincidence between continual protected activity and continual negative employment actions, and that the delays in signing timecards started

---

depends on a broad correlation between two sets of continual events within a specified time period. See, e.g., Estabrook v. Safety & Ecology Corp., 556 Fed. App'x. 152, 155 (3d Cir. 2014) ("The Court based its dismissal of Estabrook's claim on her failure to allege 'dates or times on which alleged harassment of other wom[e]n employed by SEC occurred'. . . . This level of specificity, however, is not required under Rule 8 and the standards set forth by the Supreme Court in Iqbal and Twombly.").

[10] The State Defendants cite cases supporting the proposition that exclusion from a work meeting does not constitute a materially adverse action. See State Defs.' Mem. of Law at 13 (citing, inter alia, Mabry v. Neighborhood Defender Service, 769 F. Supp. 2d 381, 399 (S.D.N.Y. 2011) ("The action which plaintiff suffered here is more akin to keeping plaintiff out of the organization's 'information loop,' which the Second Circuit in Patane v. Clark noted was insufficient, by itself, to constitute retaliation" (citing Patane, 508 F.3d at 116 n.8)). This principle has no bearing on whether such exclusion can contribute to a hostile work environment. See Dapson, 2019 WL 591692, at *15 ("Defendant generally contends . . . that the acts themselves are not sufficiently adverse to support a retaliation claim. However, when evaluating the sufficiency of a retaliation claim that involves a series of alleged retaliatory acts, the Court must consider the cumulative effect of those acts."); Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) ("[I]n determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable.") (internal quotation marks omitted).

shortly after Plaintiff filed an internal workplace complaint and criminal complaint in late October 2017. See Holcomb v. Powell, 433 F.3d 889, 903 (D.C. Cir. 2006) ("Because Holcomb repeatedly engaged in protected activity during the period when she also experienced reduced work assignments, we believe she has . . . made out a prima facie case of retaliation."); Pothen v. Stony Brook Univ., 211 F. Supp. 3d 486, 498 (E.D.N.Y. 2016) ("In short, plaintiff alleges a series of adverse actions following his alleged informal and formal complaints of discrimination. . . plaintiff has a plausible claim that the alleged adverse actions occurring after his purported protected activity were retaliatory.").

According to Plaintiff's second retaliation narrative, discrete instances of protected activity were followed by harmful actions at the hands of supervisory employees that, in context, plausibly were in reaction to her protected conduct. For instance, Plaintiff alleges that in the fall of 2018, Barlow and Dale Stone, a close friend of Dominie's, sat behind Plaintiff during a fire safety training in a manner that she alleges was menacing. See id. ¶ 106. In itself, this likely would not amount to an adverse action; but considered as one slight among many, Barlow's and Stone's conduct may have contributed to a hostile work environment. See Vega, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation . . . ."). Given the proximity of this incident to Plaintiff's informal internal complaint on June 14, 2018 regarding Barlow's allegedly retaliatory conduct, see Am. Compl. ¶ 103, causation is plausible. See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) (noting that although the Second Circuit "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship").

Additionally, Plaintiff alleges that she was subjected to retaliation through her family members. Plaintiff's daughter Aubrey was denied a reinstatement to which she was entitled under her collective bargaining agreement in July 2018, see Am. Compl. ¶¶ 144–47, within weeks of several of Plaintiff's internal complaints regarding retaliation, id. ¶¶ 102–04. Her sister Marcotte was terminated on July 3, 2019, consequent to what Plaintiff characterizes as a frivolous allegation of patient abuse. See id. ¶¶ 152–57. Plaintiff argues, correctly, that temporal proximity of six weeks between Plaintiff's filing a complaint in this action and Marcotte's termination tends to support an inference of retaliatory animus. See Gorzynski, 596 F.3d at 110. Around the same time, Plaintiff's daughter Amanda was excluded from a meeting with one of her patients so that Barlow could meet with the patient outside of Amanda's presence. See Am. Compl. ¶¶ 140–42. As discussed, this sort of action can contribute to a hostile work environment. See Spence, 2017 WL 1194478, at *8. Aside from their proximity to Plaintiff's protected acts, that these injuries coincidentally were inflicted on three of Plaintiff's family members during a period in which the Agency was engrossed in a sexual harassment crisis in which Plaintiff played a central role, reinforces an inference of causation.

The State Defendants argue that Plaintiff lacks standing to assert a retaliation claim predicated on employment actions directed at her relatives. In their brief, the State Defendants acknowledge that the Supreme Court has held that a plaintiff-relative of an employee who has engaged in protected activity has standing to assert a retaliation claim based on an adverse action the plaintiff-relative has experienced. Thompson v. North America Stainless, LP, 562 U.S. 170 (2011). See State Defs.' Mem. of Law at 18. The State Defendants, point out, correctly, that Plaintiff's claim is different: Plaintiff, who has engaged in protected activity, seeks to assert a retaliation claim based adverse actions taken against her relatives. The State Defendants—

accurately, as far as the Court's research indicates—maintain that cases citing <u>Thompson</u> tend

not to involve a fact pattern like the one in the present case. <u>See</u> <u>id.</u> (citing, *inter alia*, <u>Vormittag</u>

<u>v. Unity Electric Co., Inc.</u>, 2014 WL 4273303 (E.D.N.Y. 2014)).

But under <u>Thompson</u>, Plaintiff more clearly has standing than the <u>Thompson</u> plaintiff

himself. In <u>Thompson</u>, the Supreme Court held that the plaintiff had standing to assert a

retaliation claim based on allegations that his employer fired him after his fiancée, who worked

for the same employer, filed a discrimination charge with the Equal Employment Opportunity

Commission. <u>See</u> <u>Thompson</u>, 562 U.S. at 172. The Supreme Court adopted a standing test

borrowed from Administrative Procedure Act jurisprudence, according to which a plaintiff has

standing if she "falls within the 'zone of interests' sought to be protected by the statutory

provision whose violation forms the legal basis for his complaint." <u>See</u> <u>id.</u> at 177. The plaintiff's

injury fell within this "zone of interests," because (1) he was an employee, <u>see</u> <u>id.</u> at 178 (noting

that "the purpose of Title VII is to protect employees from their employers' unlawful actions");

and (2) he was not "collateral damage," in that "injuring him was the employer's intended means

of harming" his fiancée, <u>see</u> <u>id.</u>

This case is analogous in both respects. Like in <u>Thompson</u>, Plaintiff and her relatives are

all employees of the defendant. And by her allegations, she is not "collateral damage"; rather, the

State Defendants committed the alleged adverse actions in order to harm her. That Plaintiff is the

one who engaged in the protected activity, if anything, makes her standing clearer. Title VII's

anti-retaliation provision explicitly protects *people who oppose discrimination*. <u>See</u> 42 U.S.C. §

2000e-3(a) (providing that it is unlawful "to discriminate against any individual . . . because he

has opposed any practice made an unlawful employment practice by this subchapter"). The

Supreme Court in <u>Thompson</u> recognized, prior to addressing standing, that that a plaintiff whose

close family member had been fired could bring a retaliation claim. See Thompson, 562 U.S. at 174 ("We think it obvious that a reasonable worker might be dissuaded from engaging in protected activity if she knew that her [fiancée] would be fired.").[11] The Supreme Court regarded the issue of that family member's standing as "the more difficult question." See id. at 175. This Court is obliged to agree.[12]

Separately, Plaintiff alleges that the manner in which the State Defendants involved her in disciplinary proceedings against Dominie constituted retaliation. Namely, the State Defendants not only compelled her to testify about traumatic events in "preparation sessions" and the hearing itself, but also denied her a request to testify in a different room from her abuser. See Am. Compl. ¶¶ 119–129. The State Defendants appear to suggest that they have some form of immunity from a retaliation claim predicated on their actions in the course of an internal investigation into workplace harassment. See State Defs.' Mem. of Law at 13–15 ("Employers are entitled to carry out investigations—and attendant questioning of employees—in order to identify and, if needed, remedy circumstances in their workplaces."). But the very cases the State Defendants cite undercut this argument. See, e.g. Cox v. Onondaga Cty. Sheriff's Dep't, 760

---

[11] The concurrence observed that long-standing EEOC guidance explicitly provided as much. See id. at 179 (Ginsburg, J., concurring) ("In its Compliance Manual, the EEOC counsels that Title VII 'prohibits retaliation against someone so closely related to or associated with the person exercising his or her statutory rights that it would discourage or prevent the person from pursuing those rights.'") (alteration omitted) (quoting EEOC Compliance Manual § 8–II(C)(3) (1998)).

[12] The State Defendants cite three cases in which courts found that plaintiffs lacked standing to assert retaliation claims based on employment actions taken against relatives. See State Defs.' Mem. of Law at 19 (citing Garel v. City of New York, No. 04-CV-3506, 2006 WL 3024725, at *3 (E.D.N.Y. 2006); Fox v. Nat'l Railroad Passenger Corp., No. 06-CV-1135, 2009 WL 425806, at *3 (N.D.N.Y. 2009); Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996)). These cases were decided before Thompson, which transformed standing analysis for Title VII claims. And Kern, the only potentially binding case, involves a retaliation claim brought under § 1983, not Title VII. See Kern, 93 F.3d at 44.

30

F.3d 139, 147 (2d Cir. 2014) ("[E]mployees who complain of racial discrimination, whether internally and/or through an EEOC complaint, may not claim retaliation simply because the employer undertakes a factfinding investigation . . . . Having said that, we quickly add that *an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in a hostile work environment*[.]") (emphasis added). Plaintiff does not allege that merely involving her in an investigation was retaliatory conduct. Rather, she alleges that forcing her to repeatedly rehearse the details of her sexual assaults before the hearing started, and forcing her to testify about her sexual assaults in the same room as her abuser, a man with a history of sexual violence against whom she had been issued an order of protection, contributed to a hostile work environment. The Court agrees.

Causation is, perhaps, less clear, as this winter-spring 2019 disciplinary process did not follow closely after any particular protected act alleged. But temporal proximity does not provide a strict mathematical test of causation. Rather, "it is the role of the court to 'exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases.'" Redd v. N.Y. State Div. of Parole, 923 F. Supp. 2d 371, 388 (E.D.N.Y. 2012) (quoting Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)).

Based on Plaintiff's allegations, Dominie's disciplinary hearing was the culmination of an investigation process. Investigations take time. The State Defendants waited until the winter of 2019 to compel Plaintiff to participate in the adjudication process, because that was their first opportunity to do so. See Curcio v. Roosevelt Union Free Sch. Dist., No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) (denying summary judgment despite a one-year gap, noting, "[t]hat passage of time must be viewed in the context of this particular case: plaintiff served his EEOC complaint soon after receiving his annual performance evaluation in 2009, and,

by all appearances, he was not scheduled to receive another review until the end of the next

school year"); Bucalo v. Shelter Island Union Free School Dist., 691 F.3d 119, 131 (2d Cir.

2012) (noting that a retaliation claim was submitted to the jury notwithstanding a four-year gap

of time because defendant took the adverse action "on its first opportunity to do so").

      Moreover, earlier indications of retaliatory animus from Agency personnel involved in

the investigation process reinforce an inference of causation. In November 2017, Russo

threatened Plaintiff with discipline for purportedly speaking about her sexual harassment

complaint, even though she had not done so "in any prohibited manner." See Am. Compl. ¶ 90.

Barlow on multiple occasions "attempted to solicit statements that [Plaintiff] had been discussing

her complaints and/or cases," see id. ¶ 87, in one instance asking Rowland, Plaintiff's co-worker,

"whether [Plaintiff] made any comments about any of her complaints and telling [Rowland] to

report [Plaintiff] to the Agency if she makes any such statements," ¶ 92. Plaintiff further recounts

that Albano "threatened [Plaintiff's] job if she did not assist . . . with terminating [Dominie]." Id.

¶ 125. These incidents, in addition to contributing to a hostile work environment, support an

inference that the Agency and the State viewed Plaintiff as an adversary and her allegations of

harassment as a threat. See Chan v. NYU Downtown Hosp., No. 03-CV-3003, 2004 WL 213024,

at *3 (S.D.N.Y. Feb. 3, 2004) ("Even though an alleged act of retaliation may be separated by a

significant gap in time from the date on which a complaint of discrimination was made, evidence

of an intervening pattern of antagonism between the [complainant] and her employer could

support an inference that an alleged retaliatory act that was taken against the complainant was

causally related to her complaint of discrimination.") (citing Kachmar v. SunGard Data Systems,

Inc., 109 F.3d 173, 177 (3rd Cir. 1997)).

The State Defendants argue that the sum total of the acts detailed do not amount to a hostile work environment. See State Defs.' Mem. of Law at 19–21. In support, they cite Marquez v. City of New York, No. 14-CV-8185, 2016 WL 4767577 (S.D.N.Y. Sept. 12, 2016), a summary judgment opinion. This case is unpersuasive, not only because it involves significantly different types of retaliatory acts (there was, for instance, no alleged retaliation against relatives or compelled testimony about sexual assault), but also because of its different procedural posture. That the *evidence* in Marquez was insufficient to persuade a reasonable jury could not support a conclusion that Plaintiff's *allegations* are legally insufficient.

In short, Plaintiff has alleged a pattern of protected activity and reprisal spanning a period of roughly two years, involving a series of harmful actions by her employer that in the aggregate created a hostile work environment. Accordingly, Plaintiff has stated a claim against the Agency and the State of New York for retaliation under Title VII, and the State Defendants' Motion is denied as to this claim.

### B. NYHRL

Plaintiff asserts claims for discrimination and retaliation under state law against Barlow and Stander. She does so pursuant to a provision of the NYHRL that provides liability for employees who participate in an employer's unlawful conduct. See N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."). Barlow and Stander argue that the State's sovereign immunity against NYHRL claims precludes their individual liability, and that they were, in any case, not sufficiently involved in the alleged discrimination and retaliation to be held liable under the aider-and-abettor provision. See

Standers' Mem. of Law at 5–9; Barlow's Mem. of Law at 9–12. They are incorrect on both points, and their motions are accordingly denied as to Plaintiff's NYHRL claims.

### 1. Effect of New York State's Sovereign Immunity

Both New York State and the Agency are immune from suit, under the Eleventh Amendment to the United States Constitution, with respect to Plaintiff's NYHRL claims. See Evanoff v. New York, No. 12-CV-726, 2013 WL 6181853, at *6 (W.D.N.Y. Nov. 25, 2013) ("Nothing in the NYHRL statute provides for a waiver of the state's sovereign immunity, nor has the state waived its immunity with regard to suits in federal court alleging violations of the NYHRL.") (citing Schallop v. N.Y. Dep't of Law, 20 F. Supp. 2d 384, 391 (N.D.N.Y. 1998)); see also Panagopoulos v. New York State Dep't of Transportation, 172 F. Supp. 3d 597, 627–28 (N.D.N.Y. 2016) (noting that this immunity extends to state agencies).

Barlow and Stander argue that because aider-and-abettor liability is predicated on the underlying liability of an employer, and because the State Defendants are immune from suit, Barlow and Stander cannot be held liable. See, e.g. Barlow's Mem. of Law at 10 ("Because aiding and abetting liability cannot stand absent established liability against the employer in the first instance, Plaintiff cannot pursue individual liability claims under [NYHRL] against Barlow in federal court."). The underlying premise that individual liability is predicated on employer liability is correct. See, e.g., Strauss v. New York State Dep't of Educ., 26 A.D.3d 67, 73 (N.Y. App. Div. 3d Dep't 2005) ("Where no violation of the Human Rights Law by another party has been established, we find that an individual employee cannot be held liable for aiding or abetting such a violation.").[13]

---

[13]   See also Kelly G. v. Bd. of Educ. of City of Yonkers, 99 A.D.3d 756, 758 (N.Y. App. Div. 2d Dep't 2012); Barbato v Bowden, 63 A.D.3d 1580, 1582 (N.Y. App. Div. 4th Dep't 2009); Mascola v City Univ. of NY, 14 A.D.3d 409, 410 (N.Y. App. Div. 1st Dep't 2005).

How this principle applies in the context of sovereign immunity is unclear. Undisputedly, if an employer is found not to be liable for discrimination or retaliation on the merits, a separate party necessarily cannot be held liable for aiding and abetting. See, e.g., Mascola, 14 A.D.3d at 787 (granting a motion to dismiss with respect to aider-and-abettor claims against individual employee defendants, when the underlying gender-based hostile work environment claim against the defendant employer was dismissed due to the legal insufficiency of the allegations); Quiles v. Suffolk County Cmty. College, No. 02-CV-2399, 2006 U.S. Dist. LEXIS 113244, at *12 (E.D.N.Y. July 21, 2006) (collecting federal cases in which dismissal of an aider-and-abettor claim was premised on dismissal of an NYHRL claim against the employer on the merits). The logic behind this rule is unassailable: one cannot aid and abet discrimination or retaliation that did not occur. But the conclusion that an employer is entitled to sovereign immunity does not require a finding that the employer did not discriminate or retaliate; rather, to say that an employer is immune from suit is to say that whether or not it committed acts that violate the NYHRL, it cannot be sued. A failure to obtain a judgment against an employer does not entail a failure to establish that the employer committed conduct prohibited by the statute.

There is no appellate-level authority addressing the question of whether an employer's sovereign immunity precludes aider-and-abettor liability; and lower courts in this Circuit are split. Compare Martin v. N.Y. State Dep't of Corr. Servs., 224 F. Supp. 2d 434, 441–442 (N.D.N.Y. 2002) ("While Martin is barred [by sovereign immunity] from recovering from DOCS, he is not barred from establishing that DOCS, through its agents, aided, abetted, incited, compelled or coerced Martin's co-workers into harassing or retaliating against him."); Ramnarine v. Bronx Psychiatric Ctr., No. 16-CV-479, 2018 U.S. Dist. LEXIS 39274, at *17–18 (S.D.N.Y. Mar. 8, 2018) (noting that courts in the Southern District of New York have held that

individual liability is precluded "only where the employer/principal has been found not liable on the merits"); Daniels v. Wesley Gardens Corp., No. 10-CV-6336, 2011 WL 1598962, at *3–4 (W.D.N.Y. Apr. 27, 2011); Quiles, 2006 U.S. Dist. LEXIS 113244, at *10–12; Kantha v. Blue, 262 F. Supp. 2d 90, 109 (S.D.N.Y. 2003), with Seitz v. New York State, No. 18-CV-4149, 2019 WL 4805257, at *23 (E.D.N.Y. Sept. 30, 2019) ("Plaintiff must first establish a viable claim of liability against the University under [the NYHRL's anti-discrimination provision]; only then could she assert claims against the Individual Defendants under § 296(6) for aiding and abetting the University's violations of the [NYHRL] . . . Plaintiff cannot do so because the University and New York State are immune from [NYHRL] claims under the Eleventh Amendment."); Soloviev v. Goldstein, 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015) ("Under [the NYHRL] . . . there is a requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor . . . . Here, as Plaintiffs cannot state a claim against CUNY under [the NYRHL] because the claims are barred by the Eleventh Amendment, Plaintiffs also cannot state a claim against the Individual CUNY Defendants in their individual capacities as aiders and abettors."); Ren Yuan Deng v. New York State Office of Mental Health, No. 13-CV-6801, 2015 WL 221046, at *5 (S.D.N.Y. Jan. 15, 2015).

     This Court sides with the former school of thought, and Plaintiff, for two reasons. First, Plaintiff's position is supported by the text of the statute. The NYHRL provides that it is unlawful to aid or abet "the doing of any of the acts forbidden under this article." See N.Y. Exec. Law. § 296(6). By its terms, this provision prohibits individuals from aiding and abetting prohibited conduct, broadly, without any qualification that the prohibited conduct must have resulted in a judgment against a principal violator.

Second, the Court is persuaded by cases addressing an analogous issue in the context of §

1983 municipal liability under Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978). Pursuant to

Monell, a municipality can under certain circumstances be held liable for a constitutional tort,

based on the tortious conduct of its agents. Specifically, "[e]stablishing the liability of the

municipality requires a showing that the plaintiff suffered a tort in violation of federal law

committed by the municipal actors and, in addition, that their commission of the tort resulted

from a custom or policy of the municipality." Askins v. Doe, 727 F.3d 248, 253 (2d Cir. 2013).

Thus, as with aider-and-abettor liability, the liability of a separate, principal actor is logically

requisite to the municipal defendant's liability. Also analogously, there are cases in which the

principal violator, a municipal employee, is immune from suit, while the municipality is not.

Individual employees are entitled to "qualified immunity" when "at the time of their actions

there was no clear law or precedent warning them that their conduct would violate federal law."

Id. at 254. But this defense is not available to municipalities. See id.

The Second Circuit has held that even though a municipality's Monell liability is

derivative from an employee-principal's liability, a finding that an employee is immune from suit

does not preclude the municipality's liability. See id. at 253–54. This holding was based on a

distinction between "showing that the plaintiff suffered a tort in violation of federal law

committed by the municipal actors" and "obtain[ing] a *judgment* against the individual

tortfeasors." See id. at 253 (emphasis in original). The failure to secure a judgment against the

principal violator only precludes derivative liability "*if* the ruling in favor of the individual

defendants resulted from the plaintiff's failure to show that they committed the alleged tort." See

id. at 253–54 (emphasis in original). Under Monell, a plaintiff can proceed with a claim against a

municipality even if the plaintiff's claims against the employee-principal have been dismissed on

immunity grounds; and the plaintiff will succeed on the Monell claim if he proves, in the context

of litigation against the municipality, that the immune principal violated the law. See id. at 253.

Plaintiff can do the same here, for the same reasons. Even though she is not permitted to

bring NYHRL claims against the State Defendants, she can assert claims for aider-and-abettor

liability against Barlow and Stander. If necessary, Plaintiff and the individual defendants may

litigate the issue of the State Defendants' primary liability in the context of a dispute over

Barlow and Stander's derivative liability.[14]

## 2. *Barlow and Stander's Liability*

N.Y. Exec. Law § 296(6) extends liability to any individual defendant who "actually

participates in" an employer's unlawful conduct. Delisi v. Nat'l Ass'n of Prof'l Women, Inc., 48

F. Supp. 3d 492, 495 (E.D.N.Y. 2014) (quoting Tomka, 66 F.3d at 1317).

Plaintiff has established, for purposes of individual liability under the NYHRL, that the

State Defendants subjected her to a hostile work environment on the basis of her sex and

retaliated against her for engaging in protected activity, because she has stated analogous Title

VII claims based on the same conduct. See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295,

305 n.3 (N.Y. 2004) ("The standards for recovery under the New York State Human Rights Law

are the same as the federal standards under title VII of the Civil Rights Act of 1964.") (citations

---

[14]  Barlow and Stander contend that permitting the parties to do so violates the principle
of sovereign immunity, as determining State Defendants' primary liability would require "the
Court . . . to adjudicate the claims and find liability against the State[.]" See, e.g., Barlow's Mem.
of Law at 10. This argument appears to be based on a mistaken assumption that the State
Defendants would litigate their own NYHRL liability. See Barlow's Reply at 2–4 ("Plaintiff
asserts that the Court could nevertheless [make] a finding that [the Agency] is liable, but-for
sovereign immunity principles . . . . If the Court chose . . . to . . . render a finding like the
Plaintiff requests, any such finding would not be a factual determination, but a legal one that the
State would be forced to defend in federal court notwithstanding its Eleventh Amendment
immunity . . . . The Eleventh Amendment precludes liability from suit because it bars the suit in
whole, not just the end judgement.") (internal quotation marks and citations omitted).

omitted); <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 123–24 (2d Cir. 2013) ("Hostile work environment claims under both [federal law] and the [NYHRL] are governed by the same standard.") (first alteration in original); <u>Rivera v. Rochester Genesee Regional. Trans. Authority</u>, 743 F.3d 11, 25 n.8 (2d Cir. 2014) ("Retaliation claims under the [NYHRL] are generally governed by the same standards as federal claims under Title VII.").

Plaintiff has stated a claim against Barlow based on allegations that she was aware of Dominie's conduct toward Plaintiff, and at times a witness to it, but failed to exercise her supervisory authority to remedy the harassment. <u>See</u> Am. Compl. ¶¶ 33, 35, 57, 61, 62, 74, 78, 81; <u>Delisi</u>, 48 F. Supp. 3d at 496 (noting that "courts have found that a failure to investigate can constitute 'active participation' to support an 'aiding and abetting' claim," and collecting cases). Plaintiff has stated a claim against Stander based on allegations that he failed to remedy harassment of which he was aware, <u>see</u> Am. Compl. ¶¶ 57, 60, 79, 126, and allegations that he participated in the harassment, by engaging in simulated sex acts with Dominie in Plaintiff's presence and exchanging pornographic images with Dominie that the latter displayed to Plaintiff, <u>see</u> <u>id.</u> ¶ 42; <u>Murphy v. ERA United Realty</u>, 251 A.D.2d 469, 470–71 (N.Y. App. Div. 2d Dep't 1998) (finding individual supervisors and co-workers liable for harassment based on allegations that they "engaged in a pattern of discriminatory behavior which was morally and legally repugnant, creating a hostile working environment," by "making unwanted physical advances and crude and insulting remarks").

Plaintiff has stated retaliation claims against Barlow and Stander based on allegations that they "actually participated" in acts within the pattern of retaliation that forms the basis of Plaintiff's retaliation claim. <u>See</u> <u>Tomka</u>, 66 F.3d at 1317. For instance, Stander excluded Plaintiff from "critical communications" regarding her clients, <u>see</u> Am. Compl. ¶ 65, while Barlow did

the same to Plaintiff's daughter Amanda, see id. 140–42. Barlow also instructed Plaintiff's co-worker Rowland to monitor Plaintiff's conversations about her experiences of harassment, see id. ¶ 92, and intimidated Plaintiff at a fire safety training session, see id. ¶ 106.

Accordingly, Barlow and Stander's Motions are denied with respect to Plaintiff's NYHRL claims.

### C.  Section 1983

Plaintiff asserts a §1983 claim, alleging that "Plaintiff has a constitutionally protected property and liberty interest in her continued employment with the State free of unconstitutional harassment and/or retaliation," Am. Compl. ¶ 226, and that "Defendants violated Plaintiffs' constitutional rights by engaging in a course of conduct intended to injure the Plaintiff and which was unjustified by any legitimate governmental interest," id. ¶ 240.

As Barlow and Stander correctly argue, Plaintiff has failed to identify a specific constitutional violation. See Barlow's Mem. of Law at 12; Stander's Mem. of Law at 10. To state a claim under § 1983, a plaintiff must allege (1) the violation of a federal right (2) by a person acting under the color of state law. See Vega, 801 F.3d at 87–88. Because Plaintiff has not identified the constitutional predicate for her § 1983 claims, these claims are dismissed. The Court will entertain a motion to amend to cure this pleading defect, if filed within thirty (30) days.

### V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motions to Dismiss (Dkt. Nos. 56–58) are **GRANTED in part and DENIED in part**; Plaintiff's § 1983 claims and common law negligence claims against all defendants and Plaintiff's NYHRL claims against New York State and the New York

State Office for People with Developmental Disabilities are **DISMISSED without prejudice**.[15]

Plaintiff's Title VII claims against Barlow and Stander are **DISMISSED with prejudice**.[16]

Plaintiff's Title VII claims against New York State and the New York State Office for People

with Developmental Disabilities and Plaintiff's NYHRL claims against Barlow and Stander may

proceed; and it is further

  **ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties in accordance with the Local Rules.

  **IT IS SO ORDERED.**

DATED:  March <u>16</u>, 2021
     Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge

---

[15]  Because Plaintiff's § 1983 claims against the State Defendants and her state law claims against all defendants are dismissed by consent on sovereign immunity grounds, dismissal must be without prejudice. See <u>Commissiong v. U.S. Dep't of Hous. & Urb. Dev.</u>, No. 19-CV-8390, 2021 WL 634996, at *4 (S.D.N.Y. Feb. 16, 2021).

[16] Because Title VII does not permit claims against individuals, Title VII claims against Barlow and Stander could not be made viable through better pleading and thus are properly dismissed with prejudice. <u>See, e.g.</u>, <u>Edwards v. New Opportunities Inc.</u>, No. 05-CV-1238, 2006 WL 1668020, at *5 (D. Conn. June 16, 2006).