**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MARY TROMBLEE,

                                        Plaintiff,                    1:19-cv-00638 (BKS/CFH)

v.

THE STATE OF NEW YORK, NEW YORK STATE
OFFICE FOR PEOPLE WITH DEVELOPMENTAL
DISABILITIES; CHAD DOMINIE, Individually and in his
capacity as a Keyboard Specialist/Secretary for the Office
for People with Developmental Disabilities at the Glens
Falls Facility; LIAM STANDER, Individually and in his
capacity as a Treatment Team Leader and Supervisor for
the Office for People with Developmental Disabilities at
the Glens Falls Facility; ALEXIS BARLOW, Individually
and in her capacity as Treatment Team Leader and Office
Supervisor for the Office for People with Developmental
Disabilities at the Glens Falls Facility,

                                        Defendants.

---

**Appearances:**

*For Plaintiff*:
Ariel E. Solomon
Solomon Law Firm, PLLC
300 Great Oaks Blvd, Suite 312
Albany, NY 12203

*For Defendants the State of New York &*
*New York State Office for People with Developmental Disabilities*:
Letitia James
Attorney General for the State of New York
Robert J. Rock
William A. Scott
Assistant Attorney General, of Counsel
Office of the Attorney General
The Capitol
Albany, NY 12224

*For Defendant Liam Stander*:
Benjamin W. Hill
Capezza, Hill, LLP
30 South Pearl Street, Suite P-110
Albany, NY 12207

*For Defendant Alexis Barlow*:
Ryan T. Donovan
Conway, Donovan & Manley, PLLC
50 State Street – 2nd Floor
Albany, NY 12207

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Mary Tromblee brings this action against Defendants the State of New York,

New York Office for People with Developmental Disabilities ("OPWDD"), Chad Dominie,

Liam Stander, and Alexis Barlow asserting claims under Title VII of the Civil Rights Act of

1964 ("Title VII"), as amended 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1983, and the New York

State Human Rights Law ("NYSHRL") N.Y. Exec. Law § 290, et seq.  (Dkt. No. 88).  Presently

before the Court are Defendants New York State and OPWDD (the "State Defendants"),

Stander, and Barlow's motions for summary judgment, (Dkt. Nos. 143, 145, 147), and Plaintiff's

motion for partial summary judgment, (Dkt. No. 149).  The parties have also filed response and

reply papers.  (Dkt. Nos. 157–67,172–77).  For the reasons that follow, Defendants' motions are

granted in part and denied in part, and Plaintiff's motion is denied.

## II.    FACTS[1]

### A.    Plaintiff's Employment

OPWDD is a New York State agency that maintains offices throughout the State.  (Dkt. No. 147-1, ¶ 3).  Plaintiff was employed by OPWDD as a residential nurse.  (*Id.* ¶ 7).  She began working as a residential nurse at the Glens Falls office of OPWDD in or around May of 2016.  (*Id.* ¶ 8).

During the period of May 2016 through October 2017, Defendant Alexis Barlow ("Barlow") was employed by OPWDD as a Treatment Team Leader and Supervisor at its Glens Falls Office.  (Dkt. No. 147-1, ¶¶ 9, 15).  During this same period, Defendant Liam Stander ("Stander") was also employed by OPWDD as a Treatment Team Leader and Supervisor at the Glens Falls Office.  (*Id.* ¶ 10).  Plaintiff states that Barlow was her direct supervisor and Stander was another supervisor at the office, and that Barlow and Stander could both approve or deny her overtime requests and dictate her responsibilities at work.  (Dkt. No. 160-4, ¶¶ 8–10).  Barlow and Stander testified that they were the only OPWDD supervisors regularly at the Glens Falls Office.  (Dkt. No. 143-4, at 140; Dkt. No. 145-2, at 249).

Barlow testified that she supervised nurses including Plaintiff, and she also supervised Defendant Chad Dominie ("Dominie"), who was employed as a Keyboard Specialist/Secretary at the Glens Falls Office.  (Dkt. No. 143-4, at 25–30, 193).  Dominie testified that Barlow was his supervisor.  (Dkt. No. 160-5, at 285).  Barlow testified that her supervisory duties included approving timecards and travel requests, but that she did not have authority to transfer employees, demote/fire them, or assign them work.  (Dkt. No. 143-4, at 30–31).  Stander testified

---

[1] The facts have been drawn from the parties' statements of material facts, (Dkt. Nos. 143-10, 145-8, 147-1, 151), their respective responses and counterstatements, (Dkt. Nos. 158, 159-1, 161-1, 167-1, 173, 174-1, 176), as well as the attached exhibits, depositions, and declarations, to the extent that they are relevant and in admissible form.

that he only supervised Dominie when Barlow was out of the office, and he sometimes asked Dominie to do work.  (Dkt. No. 145-2, at 62, 123).  Stander said that he signed off on Plaintiff's timecards when Barlow was unavailable.  (Dkt. No. 145-2, at 243).

Barlow and Stander testified that as supervisors, they were obligated to immediately report any instances of sexual harassment to the Affirmative Action Officer at OPWDD.  (Dkt. No. 143-4, at 41–44; Dkt. No. 145-2, at 163).  The Affirmative Action Officer at the time, Margaret Sheehan, likewise testified that supervisors were required to immediately report to her office allegations of sexual harassment.  (Dkt. No. 160-4, at 389).

### B.    Incidents with Dominie

Plaintiff testified that in or about January 2017, Dominie put his hand down her blouse and cupped her breast.  (Dkt. No. 143-12, at 28).  Plaintiff testified that she reported the incident to Barlow, but she did not report it to Stander.  (*Id.* at 28, 67).  Barlow testified that Plaintiff did not report this incident to her, and Stander testified that he was not aware of it.  (Dkt. No. 143-4, at 197; Dkt. No. 145-2, at 104).

Another female employee at OPWDD states that in late 2016 to early 2017 she told Stander on one or two occasions "about Mr. Dominie putting his hand down my shirt and touching my breast."  (Dkt. No. 160-6, at 109).  This employee states that she met with Stander and Barlow, but she was not aware of them taking any disciplinary action against Dominie.[2] (*Id.*).  Stander testified that this employee did not complain to him about Dominie.  (Dkt. No. 145-2, at 107–08).

---

[2] In order to protect this employee's privacy in accordance with N.D.N.Y. L.R. § 5.2(a)(6), the Court will not refer to her by name.  (*See also* Dkt. No. 186).

Plaintiff testified that on two other occasions around this time, Dominie pushed her down onto a couch.  (Dkt. No. 143-12, at 30–31).  According to Plaintiff, she reported these incidents to Barlow, who witnessed one of them and told Dominie to stop "picking on" Plaintiff.  (*Id.* at 30; *see also* Dkt. No. 160-4, ¶¶ 20–21).  Barlow denies making this comment and testified that Plaintiff did not report being pushed onto a couch.  (Dkt. No. 143-4, at 212).  Stander testified that he was not aware of these incidents.  (Dkt. No. 145-2, at 104–05).  According to Plaintiff, at some point after these incidents, a meeting was held between her, Barlow, and Dominie, and Dominie promised to keep his hands off Plaintiff.  (Dkt. No. 143-12, at 31, 67).

Plaintiff testified that in January or February of 2017, Dominie said that he liked her pants and slapped her thigh, leaving a bruise.  (Dkt. No. 143-12, at 32–33).  Barlow testified that Plaintiff did not report this incident.  (Dkt. No. 143-4, at 200).  Plaintiff testified that on three or four occasions around this time, Dominie grabbed one or both of her wrists and twisted them. (Dkt. No. 143-12, at 32).

Barlow testified that in early 2017, Plaintiff complained to her that Dominie had walked up behind her and, "in a playful way," pushed the back of her knee with his knee and grabbed her wrist.  (Dkt. No. 143-4, at 53–58).  Barlow testified that Plaintiff did not say anything about bruising.  (*Id.* at 201).  According to Barlow, she told Dominie to keep his hands off Plaintiff. (*Id.* at 60).  Barlow testified that Plaintiff did not report this incident as sexual harassment and she did not consider it as such.  (*Id.* at 52–53).

Plaintiff states that on numerous occasions from December 2016 to October 2017, she "overheard conversations between Dominie and Stander in which they discussed that they were exchanging sexually explicit text messages and pictures on their cellular phones."  (Dkt. No. 160-4, ¶ 32).  Plaintiff testified that she did not recall seeing any of the pornography they

exchanged.  (Dkt. No. 143-12, at 40, 67).  She said that Dominie and Stander "would be talking about pornographic type information," and "the word dick would be used," but she could not recall any explicit language used by Stander.  (*Id.* at 67).  According to Plaintiff, Dominie and Stander also "engaged in public displays of 'dry humping' each other."  (Dkt. No. 160-4, ¶ 38).  Plaintiff testified that she "witnessed once Mr. Dominie bending Mr. Stander over a desk and dry humping him."  (Dkt. No. 143-12, at 43).  Another employee testified that this happened more than once, that Stander laughed, and that he did not tell Dominie to stop.  (Dkt. No. 160-6, at 15–16).  Barlow testified that she witnessed Dominie and Stander engage in "playful wrestling."  (Dkt. No. 143-4, at 78).  Stander testified he did not send Dominie any sexually explicit pictures; he said that Dominie "dry humped" him, that he told Dominie to stop, and he denied initiating any such behavior.  (Dkt. No. 145-2, at 81–82, 191).

Plaintiff also testified that Dominie showed her sexually explicit pictures, including a picture of his penis, and he viewed pornography on his office computer.  (Dkt. No. 143-12, at 40–41).  According to Plaintiff, Dominie made explicit, suggestive, degrading, and threatening comments to her, including comments about having sex with her.  (*Id.* at 29, 42–47; *see also* Dkt. No. 160-4, ¶¶ 40–41).

Steve Cernac, another OPWDD employee, testified that on February 20, 2017, he observed an incident where Dominie told Plaintiff that "she loved it in her ass" and "shooting in her face."  (Dkt. No. 160-5, at 151–54).  Cernac also testified that Dominie was being "touchy-feely" with Plaintiff, and "they were kind of grabbing onto one another."  (*Id.* at 154).  Cernac said that he heard a "loud crack," and Plaintiff indicated that Dominie had smacked her bottom.  (*Id.*; *see also* Dkt. No. 160-6, at 462).  Cernac testified that he informed Stander about the incident "verbatim."  (Dkt. No. 160-5, at 156, 168; *see also* Dkt. No. 160-6, at 462).  Cernac said

that Stander assured him that the issue had been addressed with Dominie.  (Dkt. No. 160-5, at 157).  Plaintiff testified that a meeting was held with Barlow, herself, and Dominie, and Dominie "agreed for boundaries."  (Dkt. No. 143-12, at 69, 77).  Stander testified that Cernac informed him that Dominie had said something inappropriate to Plaintiff.  (Dkt. No. 145-2, at 113).  Stander testified that he reported Cernac's allegation to Barlow because she was Dominie's direct supervisor; and that he and Barlow spoke with Dominie and told him that his behavior was unacceptable.  (*Id.* at 124–29).  Barlow testified that Stander did not give her details about Dominie's comments but told her that he had taken care of it.  (Dkt. No. 143-4, at 158).  Dominie testified that he did not make any such comments to Plaintiff, and that Stander and Barlow did not meet with him about Cernac's allegation.  (Dkt. No. 160-5, at 314–15).

Plaintiff states that in February or March of 2017, after she complained about Dominie's behavior, he placed a fake rat on her desk and called her a "nark" and a "rat."  (Dkt. No. 160-4, ¶ 45).  Barlow testified that she was unaware of the fake rat.  (Dkt. No. 143-4, at 199).  Plaintiff states that on several occasions around June and July of 2017, Dominie "flung hand sanitizer at her."  (Dkt. No. 160-4, ¶ 47).  Plaintiff further testified that in July of 2017, Dominie lifted her shirt up, exposing her torso.  (Dkt. No. 143-12, at 35).  According to Plaintiff, on two other occasions around this time, Dominie lifted up her dress so he could see her underwear.  (*Id.* at 38; *see also* Dkt. No. 160-4, ¶ 49).  Plaintiff testified that she reported these incidents to Barlow, who said she discussed them with Dominie.  (Dkt. No. 143-12, at 38).  Barlow testified that she did not recall Plaintiff reporting these incidents.  (Dkt. No. 143-4, at 207).  Plaintiff states that on another occasion, Dominie walked into the entrance of her cubicle, unzipped his pants, and exposed himself to her.  (Dkt. No. 160-4, ¶ 50).

In September of 2017, Dominie was out of the office on medical leave; Barlow testified that around this time Plaintiff told her that she felt uncomfortable about Dominie coming back to the office.  (Dkt. No. 143-4, at 169).  Barlow testified that she wasn't "terribly concerned" because Plaintiff sometimes engaged in playful antics with Dominie, such as running up to him, punching him in the arm, and running away.  (*Id.* at 170).  Barlow also testified that Plaintiff would act like Dominie's friend by often laughing and giggling around him.  (*Id.* at 171).  Barlow believed that Plaintiff initiated and enjoyed Dominie's attention.  (*Id.* at 174).  Dominie testified that he did not harass Plaintiff and that they were "very friendly" and joked with each other.  (Dkt. No. 160-5, at 293–300).

According to Plaintiff, on October 11, 2017, Dominie shoved her into a chair, straddled her legs, held her hands over her head and said words to the effect of "if you aren't going to fucking give me what I want then I am going to take it."  (*See* Dkt. No. 143-12, at 39; Dkt. No. 160-4, ¶ 51).  Plaintiff believed that Dominie was going to rape her and screamed for help, causing Dominie to leave.  (Dkt. No. 160-4, ¶¶ 51–52).

On October 16, 2017, Plaintiff reported the October 11th incident to Barlow and Stander.  (*See* Dkt. No. 143-12, at 43; Dkt. No. 160-4, ¶ 54).  According to Plaintiff, Barlow and Stander called Dominie into the office and he apologized and wanted to hug Plaintiff.  (*See* Dkt. No. 143-12, at 43).  Barlow testified that she confronted Dominie, she or Stander reported the incident the next day to the Affirmative Action Officer, and she called the Glens Falls Police Department.  (Dkt. No. 143-4, at 85, 87, 218–20).  Neither Barlow nor Stander made a written report.  (*Id.* at 87, 92; Dkt. No. 145-2, at 201).  Stander testified that he reported Plaintiff's complaint to the Affirmative Action Officer.  (Dkt. No. 145-2, at 153).  Stander also testified that he had no idea "things were going on" between Plaintiff and Dominie.  (*Id.* at 154).

Plaintiff testified that she had no contact with Dominie after October 18, 2017, except for an arbitration regarding disciplinary action where she testified against him. (Dkt. No. 143-12, at 60). On October 19, 2017, Plaintiff filed a formal internal complaint against Dominie alleging sexual harassment. (Dkt. No. 160-4, ¶ 81). That same day, Dominie was placed on administrative leave. (Dkt. No. 149-4, at 2).

On October 25, 2017, Plaintiff filed criminal charges and a supporting deposition against Dominie with the Glens Falls Police. (Dkt. No. 160-4, ¶ 82). Plaintiff states that in late October or November of 2017, she had to transfer to a position at the Corinth office of OPWDD to avoid continuing harassment. (*Id*. ¶ 60). On November 28, 2017, Dominie was arrested, and on April 16, 2018, he pled guilty to a criminal harassment charge relating to the October 11th incident. (Dkt. No. 149-14, at 2; Dkt. No. 160-5, at 301).

On April 16, 2018, Plaintiff was issued an Order of Protection against Dominie. (Dkt. No. 160-4, ¶ 86). On May 24, 2018, Plaintiff was advised that the investigation by OPWDD had found her allegations against Dominie to be substantiated. (Dkt. No. 147-1, ¶ 22).

### C.    Disciplinary Action

On April 20, 2018, OPWDD issued to Dominie a Notice of Suspension and Suspension Notice of Discipline, informing him of eight misconduct charges concerning his treatment of Plaintiff at the Glens Falls office:

- **Charge 1:** On October 11, 2017, you entered your co-worker, Mary Tromblee's cubicle, pushed her into her chair, straddled her legs, held her hands over her head, got in her face and stated, "if you're not going to fucking give me what I want then I am going to take it," or words to that effect.

- **Charge 4:** In January 2017, you created a hostile work environment. Specifically, you . . . approached Mary Tromblee from behind while she was on the telephone, reached over her shoulder, put your hand down her shirt, cupped her left breast, and pulled your hand out and walked away.

- **Charge 5:** In January 2017, you created a hostile work environment. Specifically, you: tackled Mary Tromblee on the couch that is in the entry way of the office; grabbed Mary Tromblee's wrists, leaving bruise marks; slapped Mary Tromblee on her thigh, leaving a bruise; put a fake rat on Mary Tromblee's desk after she reported your actions to a supervisor; called Mary Tromblee a "Snitch," "Rat Girl," and "Nark," after she reported your actions to a supervisor; and threw hand sanitizer over your cubicle wall, hitting Mary Tromblee in the back of the head with it.

- **Charge 6:** On February 20, 2017, you created a hostile work environment when you "smacked" Mary Tromblee on her butt.

- **Charge 7:** On February 20, 2017, you created a hostile work environment. Specifically you: made offensive sexual comments to Mary Tromblee in the presence of others. You stated to her that she "loved it in her ass and loved it shooting on her face," or words to that effect; and stated to Mary Tromblee, "shut your whore mouth and go make me a sandwich because that's what women are good for, to be on their knees and make food," or words to that effect.

- **Charge 9:** In February 2017, you created a hostile work environment when you tackled Mary Tromblee on the couch that is in the entry way of the office.

- **Charge 10:** In July 2017: you created a hostile work environment. Specifically, you: lifted up Mary Tromblee's dress with a hammer on two occasions, exposing her underpants; blocked the entrance of Mary Tromblee's cubicle and would not let her out. You unzipped your pants and showed her the head of your penis; and approached Mary Tromblee from behind as she sat at her desk and lifted her shirt over her head.

- **Charge 11:** In July 2017, you created a hostile work environment. Specifically, you: [t]old Mary Tromblee, "we are going to fuck," or words to that effect; told Mary Tromblee, "you have fuck me eyes," or words to that effect; told Mary Tromblee, "if you see what I have you will want to fuck me," or words to that effect.

(Dkt. No. 149-6, at 2–7) (formatting cleaned up). Dominie was also charged with several offenses not involving Plaintiff. (*Id.* at 4–7). Dominie was informed that a disciplinary proceeding had been instituted against him pursuant to Article 33 of the Agreement between the State of New York and the Institutional Services Bargaining Unit of the Civil

Service Employees Association, and that OPWDD was seeking a penalty of termination. (*Id.* at 2).  Dominie was informed that he could grieve the Notice of Discipline or appeal directly to final and binding arbitration.  (*Id.*).

### D.      Arbitration

Dominie filed a grievance and the matter proceeded to arbitration pursuant to a Collective Bargaining Agreement ("CBA").  (*See* Dkt. No. 149-3).  The CBA states that "the disciplinary arbitrators shall render determinations of guilt or innocence and the appropriateness of proposed penalties." (Dkt. No. 149-9, at 5).  The CBA further states that the "disciplinary arbitrator's decision with respect to guilt or innocence, penalty, . . . shall be final and binding upon the parties." (*Id.*).

On March 28, 2018 and April 29, 2018, hearings were held before Arbitrator Mary L. Crangle.  (Dkt. No. 149-3, at 3).  The parties had an opportunity to present evidence and argument, engage in the examination and cross-examination of witnesses, and otherwise support their positions.  (*Id.*).  The following issues were submitted for arbitration: 1) Is the Grievant guilty of the allegations contained in the Notice of Discipline dated April 20, 2018; 2) If guilty, is the proposed penalty of termination appropriate; 3) If termination is not appropriate, what shall the penalty be, if any; 4) Did the Employer have probable cause under the CBA to suspend the Grievant without pay effective April 20, 2018.  (*Id.* at 3–4).

Plaintiff states that she was compelled by the State Defendants to testify in person at the arbitration proceeding, which caused her great stress and anguish.  (Dkt. No. 160-4, ¶ 121). According to Plaintiff, she was threatened with termination if she did not cooperate.  (Dkt. No. 143-12, at 95; Dkt. No. 160-4, ¶ 126).  David Albano, a Human Resources Specialist at OPWDD, states that Plaintiff's testimony was essential for the disciplinary hearing, and he advised her that "administrative enforcement" might be taken against her if she did not testify.

(Dkt. No. 147-5, ¶¶ 7–9).  Plaintiff states that she viewed this treatment as retaliation for her prior complaints of discrimination and retaliation.  (Dkt. No. 160-4, ¶ 133).

Dominie moved to dismiss several charges on the basis that they were time-barred or lacked supporting evidence, and as relevant here, the Arbitrator dismissed charges 7 and 11 involving Dominie and Plaintiff.  (Dkt. No. 149-3, at 8–9).  On July 16, 2019, the Arbitrator issued a written decision addressing the remaining charges.  (*Id.* at 2–22).  The Arbitrator found that charges 6 and 9 were not supported by direct evidence, and therefore, these charges were dismissed for lack of proof.  (*Id.* at 14).  After considering all the evidence, the Arbitrator credited Plaintiff's version of events as alleged in charges 1, 4, 5, and 10, noting that much of her testimony was corroborated by co-workers.  (*Id.* at 16).  The Arbitrator also found that "supervision did not take the appropriate steps to address her legitimate concerns."  (*Id.* at 17).  The Arbitrator concluded that "the State has proven by the requisite preponderance of the evidence the allegations in Charges 1, 4, 5, and 10 and therefore these Charges are sustained."  (*Id.*).

Next, the Arbitrator found that the proposed penalty of termination was not appropriate for Dominie.  (Dkt. No. 149-3, at 19).  The Arbitrator noted that employees have the right to a workplace free of sexual harassment, and Dominie "clearly engaged" in misconduct, but there were mitigating circumstances that warranted a lesser penalty: 1) Dominie had almost 20 years of service with no evidence of discipline for prior conduct of the same nature; 2) the parties were no longer working in the same office; and 3) there was a "decided lack of supervisory authority over conduct in the workplace at the Glens Falls Office during the relevant time period."  (*Id.*).  The Arbitrator stated that "[s]upervision should have acted sooner to control the inappropriate

workplace conduct," and "[t]he fact that no such action was taken until October of 2017 sent the wrong message." (*Id.* at 19–20).

In sum, the Arbitrator found that the appropriate penalty for Dominie was a lengthy suspension, which he had effectively served while arbitration was pending. (*Id.* at 20). Therefore, the Arbitrator ordered that Dominie "be returned to work as soon as practicable after receipt of this Decision and Award, but without any back pay." (*Id.*). Accordingly, the Arbitrator's Award found that: 1) Dominie was guilty of Charges 1, 4, 5, and 10; 2) the appropriate penalty was a suspension; and 3) the State had probable cause to suspend Dominie without pay effective April 20, 2018. (*Id.* at 21–22).

### E.   Vacatur Decision

Following the arbitration, OPWDD filed an action in New York State Supreme Court seeking to vacate the Arbitrator's Decision and Award on the basis that the penalty imposed violated public policy; on January 31, 2020, the court (James H. Ferreira, J.) issued a decision granting relief. (Dkt. No. 149-7, at 3–11). The court concluded that the Arbitrator's Decision and Award "must be vacated because the penalty imposed – which included reinstating Mr. Dominie to his prior employment position without conditions or limitations – directly conflicts with well-established public policy considerations prohibiting sexual harassment in the workplace." (*Id.* at 9). The court recognized that the Arbitrator had found Dominie to have engaged in "egregious" and repeated harassment of Plaintiff, which continued even after he was warned by his employer. (*Id.*). The court thus concluded that the Arbitrator's Decision and Award reinstating Dominie to his prior position without condition or limitation "is contrary to and violative of public policy because it does not adequately protect Mr. Dominie's co-workers from sexual harassment in the future." (*Id.* at 10). The court also found that the mitigating factors cited by the Arbitrator did not "alleviate the conflict between the penalty imposed and

public policy prohibiting sexual harassment in the workplace." (*Id.*).  The court vacated the

Decision and Award "in its entirety" and remitted the matter for the imposition of a new penalty

before a new arbitrator.  (*Id.* at 11).

### F.      Appellate Division

Following the vacatur decision, Dominie's union appealed to the State of New York

Supreme Court, Appellate Division, Third Department.  (Dkt. No. 149-8, at 4–9).  On April 29,

2021, the court (Lynch, J.) issued a decision finding that the "Supreme Court properly vacated

the award as violative of the public policy prohibiting sexual harassment." (*Id.* at 8).  The court

noted that "[t]he findings of the arbitrator are not challenged on this appeal, only the penalty."

(*Id.* at 7).  The court concluded that "[t]he award fails to account for the rights of other

employees to a non-hostile work environment and conflicts with the employer's obligation to

eliminate sexual harassment in the workplace." (*Id.* at 8).  The court also concluded that the

Supreme Court was authorized to remand the matter to a different arbitrator for the imposition of

a new penalty.  (*Id.*).

### G.      Remand Decision

On August 20, 2021, Arbitrator Thomas N. Rinaldo issued an Opinion and Award in

accordance with the remand.  (Dkt. No. 187, at 2–11).  The issue before the Arbitrator was

limited to "what shall be the Grievant's newly determined appropriate penalty for the Decision

and Award of Arbitrator Crangle dated July 16, 2029." (*Id.* at 3).  The Arbitrator found "that the

record fully establishes the justification of the State's proposed penalty of termination." (*Id.* at

11).  The Arbitrator concluded that: "[t]he severity of Grievant's misconduct coupled with the

total absence of mitigating circumstances or any other reason to believe that Grievant's return to

the workforce would not impose an unacceptable risk on the State leads this Arbitrator to

conclude that the question presented must be answered such that termination is the only appropriate penalty." (*Id.*). This decision was not appealed. (*Id.* at 1).

### H.   Other Events

Plaintiff states that she "was always in constant fear of Dominie's return to the office and to OPWDD, and no one could guarantee that I would not be further exposed to him." (Dkt. No. 160-4, ¶ 62). Plaintiff testified that Dominie's voice remained on the OPWDD voicemail for a time after October 2017, and hearing it caused her continuing distress. (Dkt. No. 143-12, at 65, 80, 89). Plaintiff states that she asked Stander to change the voicemail but he failed to do so. (Dkt. No. 160-4, ¶ 106). Plaintiff also states that at some point Stander excluded her from "critical communications regarding vulnerable (disabled) individuals for whom I was responsible." (*Id.* ¶ 103).

Plaintiff states that in November of 2017, an OPWDD employee named Michelle Russo threatened her with discipline for allegedly speaking about her sexual harassment complaint. (*Id.* ¶ 110). In December 2017, Plaintiff requested a different supervisor, and thereafter Barlow no longer supervised Plaintiff. (*See* Dkt. No. 143-4, at 251). Plaintiff states that in the spring of 2018, OPWDD prevented her from competing for another position "by refusing to make this vacant position available after learning that I was interested in filling it, in reprisal for complaining about Dominie's conduct." (Dkt. No. 160-4, ¶ 112).

On July 11, 2018, Plaintiff filed an internal complaint alleging that her supervisors had retaliated against her by delaying signing her timecards. (*See id.* ¶ 89). According to Plaintiff, from about November 2017 onwards, her timecards were not signed in a timely manner, "thereby delaying [her] compensation for overtime pay and creating a financial hardship." (*Id.* ¶ 107). Barlow denied any delay on her part and testified that Plaintiff failed to submit her timecards in a timely manner. (Dkt. No. 143-4, at 256).

14

On or about August 1, 2018, Plaintiff filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), and she later received a Notice of Right to Sue.  (*See* Dkt. No. 160-4, ¶¶ 90–91).  On August 21, 2018, Barlow and Stander received a formal counseling memorandum for not immediately reporting the October 11, 2017 incident.  (*See* Dkt. No. 143-4, at 213–18; Dkt. No. 145-2, at 206–10, 218).  The memorandum stated that they waited "several days" to report the incident "because the employee indicated that they did not want you to report it at the time."  (Dkt. No. 160-4, at 197).

Plaintiff states that in the fall of 2018, she attended a training and Barlow sat behind her, even though other seats were open; Plaintiff felt this was retaliation for reporting Dominie's misconduct.  (Dkt. No. 160-4, ¶ 111).  In November of 2018, Margaret Sheehan, OPWDD's Affirmative Action Officer, issued an investigation report which found that Plaintiff's allegations of retaliation were not substantiated.  (Dkt. No. 147-16).  Ms. Sheehan found that "[t]here were legitimate and rationale reasons for all of the incidents about which Complainant complained—the posting of the RN position, the admonitions not to discuss an ongoing investigation, and the late approval of the 8-time cards."  (*Id.* at 18).

Plaintiff testified that her sister Marcia Marcotte, who also worked for OPWDD, was terminated as retaliation against Plaintiff.  (Dkt. No. 143-12, at 88).  David Albano states that Marcotte's probationary employment was terminated in 2019 based on a substantiated allegation that she neglected a patient by dozing off while on duty.  (Dkt. No. 147-5, ¶¶ 12–14).  Ms. Marcotte testified that she did not fall sleep on the job.  (Dkt. No. 160-6, at 438–39).  Plaintiff further states that her two daughters, both of whom at times worked for OPWDD, were mistreated as retaliation against Plaintiff.  (Dkt. No. 160-4, ¶¶ 136–54).  Plaintiff states that in

February of 2019, OPWDD set up a "sham interrogation" regarding an issue that she was not involved in, led by a friend of Dominie.  (*Id.* ¶¶ 119–20).

On May 29, 2019, Plaintiff commenced this action.  (Dkt. No. 1).  On or about August 23, 2019, Plaintiff filed a second charge of discrimination with the EEOC, and she received a Notice of Right to Sue.  (Dkt. No. 160-4, ¶¶ 93–94).  On or about October 13, 2020, Plaintiff applied for retirement, at the age of 55 years old.  (Dkt. No. 147-1, ¶ 30; Dkt. No. 143-12, at 98).  Plaintiff left employment with the State and OPWDD on or about November 30, 2020.  (Dkt. No. 147-1, ¶ 31).  Plaintiff testified that she was forced to retire due to the intolerable conditions at OPWDD.  (Dkt. No. 143-12, at 98).  On or about April 7, 2021, Plaintiff filed a third EEOC charge of discrimination, and she received a Notice of Right to Sue.  (Dkt. No. 160-4, ¶¶ 95–96).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see Selevan v. N.Y. Thruway Auth*., 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the

nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250 (internal quotation marks and citations omitted); *see Celotex*, 477 U.S. at 323–24; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Emp. & Rest. Emp. Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d

534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted)).

## IV. DISCUSSION

Plaintiff has seven claims relevant to the pending motions: 1) discriminatory hostile work environment in violation of Title VII, as against Defendants New York State and OPWDD; 2) aiding and abetting a discriminatory hostile work environment in violation of New York law, as against Defendants Barlow and Stander; 3) discriminatory hostile work environment in violation of Section 1983, as against Defendants Barlow and Stander; 4) retaliation in violation of Title VII, as against Defendants New York State and OPWDD; 5) retaliation in violation of New York law, as against Defendants Barlow and Stander; 6) discrimination and retaliation in violation of Section 1983, as against Defendants Barlow and Stander; and 7) constructive discharge in violation of Title VII, as against Defendants New York State and OPWDD.[3] (Dkt. No. 88).

Defendants New York State, OPWDD, Barlow, and Stander contend that all of Plaintiff's claims against them are subject to summary judgment. (*See* Dkt. Nos. 143-1, 145-6, 147-2). In contrast, Plaintiff argues that she is entitled to summary judgment on her hostile work environment claims based on the doctrine of collateral estoppel and the Arbitrator's findings. (Dkt. No. 149-17).

### A. Preclusion

As an initial matter, the Court will address Plaintiff's preclusion argument, which if valid, would resolve much of this case. Plaintiff contends that the doctrine of collateral estoppel, which the Court will refer to as issue preclusion, bars OPWDD from re-litigating: 1) "the

[3] Plaintiff has withdrawn her Third Claim in the Second Amended Complaint, gender discrimination based on disparate treatment in violation of Title VII, as against Defendants New York State and OPWDD. (Dkt. No. 188). Therefore, this claim will be dismissed with prejudice. Plaintiff has also asserted claims against Defendant Dominie, which are not addressed herein as he did not file a motion.

question of whether Mary Tromblee was subjected to a hostile working environment"; and 2) "the question of whether Tromblee was retaliated against for opposing discrimination." (Dkt. No. 149-17, at 15). According to Plaintiff, these same issues were already litigated in the arbitration proceeding and the Arbitrator's findings should apply in this case to establish the elements of Plaintiff's claims. (*Id.* at 16–27). Plaintiff also asserts that subsequent court decisions relied upon these findings and that failure to apply issue preclusion would risk inconsistent judgments. (*Id.* at 27–28). In response, the State Defendants argue that issue preclusion does not apply to Plaintiff's claims against them. (Dkt. No. 157, at 9–15).

### 1.    Relevant Law

In general, issue preclusion "bars litigation of an issue when '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013) (quoting *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006)). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion," whereas "the burden of showing that the prior action did not afford a full and fair opportunity to litigate the issues rests with . . . the party opposing the application of issue preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996).

The preclusive effect of an arbitration decision (or lack thereof) was explained by the Supreme Court in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36 (1974). In that case, the court held that a plaintiff was not precluded from filing suit under Title VII even though he had raised a similar claim during the arbitration of a prior contractual dispute with his employer because of the important differences between the two forums:

> In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under Title VII, an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both rights to be enforced in their respectively appropriate forums.

*Id.* at 49–50. The court noted that "[t]he policy reasons for rejecting the doctrines of election of remedies and waiver in the context of Title VII are equally applicable to the doctrines of res judicata and collateral estoppel." *Id.* at 49 n.10. In addition, the court stated that while not entitled to preclusive effect, "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Id.* at 60.

Similarly, in *McDonald v. West Branch*, the Supreme Court addressed the issue of "whether a federal court may accord preclusive effect to an unappealed arbitration award in a case brought under [42 U.S.C. § 1983]." 466 U.S. 284, 285 (1984). The court held that, "in a § 1983 action, a federal court should not afford res judicata *or collateral-estoppel* effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." *Id.* at 292 (emphasis added). But the court has not squarely faced the question of whether an arbitrator's factual findings (as opposed to the decision itself) can create issue preclusion in a later federal suit.

Nor has the Second Circuit, which has noted that "the preclusive effect of arbitrations is a difficult and complex issue." *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310 (2d Cir. 2005). A recent unpublished case is nonetheless informative. In *Siddiqua v. New York State Dept. of Health*, the Second Circuit found that an arbitration decision resolving contract-based claims under a CBA had no preclusive effect on a plaintiff's statutory claim under the Family and Medical Leave Act ("FMLA"). 642 F. App'x 68, 70 (2d

Cir. 2016) (summary order).  The court noted that "Siddiqua sought only to vindicate her contractual rights under the terms of the collective bargaining agreement in submitting her grievance to arbitration."  *Id.* at 71.  Citing *Gardner-Denver*, the court stated that "to the extent that the arbitration of Siddiqua's contractual rights in this case might be 'similar to, or duplicative of, the substantive rights secured by' the FMLA, this prior arbitration does not preclude a federal court from reconsidering all factual issues underlying her statutory FMLA claims."  *Id.*  The court noted, in a footnote, that *Gardner-Denver* "prohibits a court from dismissing Siddiqua's FMLA claims by giving preclusive effect to findings of fact made by the Arbitrator in resolving Siddiqua's contract claims."  *Id.* at 71 n.2.

### 2.    Analysis

The Court finds that issue preclusion is not appropriate in this case.  As discussed above, *Gardner-Denver* and its progeny stand for the proposition that findings made in contractual arbitration are not entitled to preclusive effect in litigation of *statutory* claims.  Here, the arbitration took place between Dominie's union and the State of New York pursuant to a CBA. As directed by the CBA, the arbitration was held to resolve Dominie's grievance of the disciplinary action against him.  (Dkt. No. 149-3, at 3; Dkt. No. 149-9).  The Arbitrator's authority was expressly limited to rendering a determination of Dominie's guilt or innocence as to the disciplinary charges and determining the appropriateness of the proposed penalty.  (Dkt. No. 149-9, at 5).  The Arbitrator had no authority to resolve any statutory claims, and Plaintiff was not even a party to the proceeding.  Although the Arbitrator found Dominie guilty of creating a "hostile work environment," her decision did not reference any statutory standard for that term.  (Dkt. No. 149-3, at 3–22).  Similarly, while the Arbitrator found that "[s]upervision should have acted sooner" to stop Dominie's conduct, the decision did not reference any legal standard for defining a supervisory relationship.  (*Id.* at 19–20).  Moreover, the issue of

supervision was not necessary to resolve for the Arbitrator's decision.  And the fact that the CBA

states that the Arbitrator's decision was "final and binding" clearly refers to the resolution of the

grievance at issue, not statutory claims arising from the same conduct.  (*See* Dkt. No. 149-9, at

5).  Simply put, the issues and interests of the parties differ markedly in this case versus the

arbitration.

Plaintiff's arguments to the contrary are not persuasive, as she does not address *Gardner-*

*Denver* and its progeny but instead relies on inapposite and distinguishable cases applying New

York State law.  For example, in *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, the court

found that issue preclusion applied to a narrow finding about the enforceability of a contract that

had been resolved in a prior arbitration, where that exact same issue had been fully litigated and

there was no dispute that the arbitration award was final and conclusive between the parties.  406

N.E.2d 445, 452 (N.Y. 1980).  Similarly, in *Gooshaw v. City of Ogdensburg*, the court found that

issue preclusion applied to a certain contractual interpretation where the same issue had been

resolved in arbitration.  889 N.Y.S.2d 722, 725 (N.Y. App. Div. 3d Dept. 2009).  In contrast, the

issues in this case are statutory in nature and significantly broader than those resolved in the

contractual arbitration.

To the extent Plaintiff argues that Arbitrator's findings were appealed and adopted by

later courts, that would not entitle them to preclusive effect because both courts only considered

the penalty imposed by the Arbitrator, not the merits of Plaintiff's sexual harassment and hostile

work environment claims.[4]  (Dkt. No. 149-7, at 3–11; Dkt. No. 149-8, at 4–9).  In other words,

---

[4] The Court notes that the Arbitrator's findings in the first decision were implicitly adopted in the later remand arbitration as to the appropriate penalty, (Dkt. No. 187), and there is no dispute that the latter decision is final.

the merits of Plaintiff's federal case were not actually litigated in the later court decisions so as to create a judicial basis for issue preclusion.

In sum, although this case involves many of the same factual issues determined in the arbitration decision, there is no convincing authority for giving those findings preclusive effect at this stage of the proceedings.  Because the arbitration was conducted pursuant to a CBA that did not cover any statutory claims, the parties may relitigate the factual issues that comprise Plaintiff's statutory claims.  Therefore, Plaintiff is not entitled to summary judgment on her hostile work environment claims based on the doctrine of issue preclusion.  *See Figueroa v. Garland*, No. 21-cv-7849, 2022 WL 17539114, at *7, 2022 U.S. Dist. LEXIS 220026, at *20–21 (S.D.N.Y. Dec. 6, 2022) ("Findings made in arbitration pursuant to a 'collective-bargaining agreement [that does] not cover statutory claims,' however, are not preclusive in later federal-court proceedings for relief under antidiscrimination statutes.") (citing *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 262 (2009)); *see also Del Villar v. Hyatt Hotel Corp.*, No. 19-cv-0891, 2022 WL 2316205, at *1, 2022 U.S. Dist. LEXIS 114294, at *3 (S.D.N.Y. June 28, 2022) (declining to give preclusive effect to factual findings from contractual arbitration in the adjudication of statutory claims); *see also Miller v. City of Ithaca*, No. 10-cv-597, 2019 WL 5883697, at *6, 2019 U.S. Dist. LEXIS 195707, at *16  (N.D.N.Y. Nov. 12, 2019) (same).

A final note before moving on.  Although the Arbitrator's findings are not entitled to preclusive effect, that does not mean the Court must ignore them.  The Second Circuit has indicated that an arbitration decision can be considered among other evidence in evaluating a discrimination claim.  *See Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002). In *Collins*, the court found that a negative arbitration decision rendered under a CBA did not preclude the plaintiff's Title VII discrimination claim but it was nonetheless probative evidence

on the issues of intent and causation.  *Id.*  The Court will follow this approach and consider the Arbitrator's findings in evaluating the elements of Plaintiff's claims.

### B.       Hostile Work Environment – Title VII – State Defendants

The State Defendants argue that Plaintiff's Title VII discriminatory hostile work environment claim is subject to summary judgment because Dominie's conduct cannot be imputed to them.  (Dkt. No. 147-2, at 10–14).  In response, Plaintiff primarily argues that the State Defendants are liable for Dominie's conduct because they had notice of it and failed to take appropriate remedial action.  (Dkt. No. 165, at 12–23).

#### 1.       Relevant Law

To establish a hostile work environment claim under Title VII, a plaintiff must demonstrate harassment on the basis of his or her sex, 42 U.S.C. § 2000e-2(a), and "that his or her workplace was 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [his or] her employment were thereby altered.'"  *Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (quoting *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013)).  The hostile work environment standard includes "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive."  *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).  "To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse."  *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).

A plaintiff must also show "a specific basis for imputing the hostile work environment to the employer."  *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).  The standard for

imposing liability on an employer for workplace harassment by employees depends on the status of the harasser:

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions.  In cases in which the harasser is a "supervisor," however, different rules apply.  If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State U.*, 570 U.S. 421, 424 (2013) (internal formatting omitted) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998)).  In *Vance*, the Supreme Court further held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.*  A tangible employment action constitutes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quoting *Ellerth*, 524 U.S. at 761).

To establish an employer's negligence in controlling workplace conditions, a plaintiff must demonstrate that his employer: (i) "failed to provide a reasonable avenue for complaint"; or (ii) "knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000)).  The latter "requires a plaintiff to show that (1) someone had actual or constructive knowledge of the harassment, (2) the knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Duch*, 588 F.3d at 763.

With respect to imputing the knowledge of an employee to their employer, the Second Circuit has explained that: "[a]n official's actual or constructive knowledge of harassment will be imputed to the employer when principles of agency law so dictate," which may happen in three scenarios: 1) "the official is at a sufficiently high level in the company's management hierarchy to qualify as a proxy for the company"; 2) "the official is charged with a duty to act on the knowledge and stop the harassment"; or 3) "the official is charged with a duty to inform the company of the harassment." *Duch*, 588 F.3d at 763 (citing *Torres v. Pisano*, 116 F.3d 625, 636–37 (2d Cir. 1997)) (alteration in original).  A supervisor's knowledge is imputable to his employer because he is "charged with a duty to act on the knowledge and stop the harassment." *Id.* (citing *Torres*, 116 F.3d at 636–37).  "For non-supervisory co-workers who "lack authority to counsel, investigate, suspend, or fire the accused harasser, the co-worker's inaction does not spark employer liability unless that co-worker has an official or strong de facto duty to act as a conduit to management for complaints about work conditions." *Id.* (citations and internal formatting omitted).

## 2.    Analysis

In this case, the State Defendants do not appear to dispute that Plaintiff was subject to a discriminatory hostile work environment based on Dominie's sexual harassment.  Plaintiff has adduced evidence that during the period from January through October 2017, Dominie subjected her to egregious and repeated harassment including sexual comments, unwanted touching, exposing himself, and threatening to rape her.  (Dkt. No. 143-12, at 28, 30–32, 35, 38–39; Dkt. No. 149-3, at 2–22; Dkt. No. 149-6, at 2–7; Dkt. No. 160-4, ¶¶ 8–52).  The Court notes that there is some evidence that, until October 2017, Dominie's behavior was more benign in nature and even welcomed by Plaintiff.  (*See* Dkt. No. 143-4, at 170–74; Dkt. No. 160-5, at 293–300).  However, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find

that Dominie's sexual harassment was severe and pervasive enough to be objectively abusive and that Plaintiff subjectively perceived it to be so.  Therefore, Plaintiff has raised an issue of fact as to whether she experienced a discriminatory hostile work environment.

To prevail on her claim against the State Defendants, Plaintiff must also show that there is a basis for imputing the hostile work environment to her employer.  The State Defendants argue that Plaintiff cannot show any basis for imputation because Dominie was not a supervisor and they took appropriate remedial action by suspending him after Plaintiff formally reported harassment on October 19, 2017.  (Dkt. No. 147-2, at 13–14).  In response, Plaintiff primarily argues that the State Defendants had earlier notice of Dominie's misconduct and failed to take appropriate remedial action.[5]  (Dkt. No. 165, at 12–23).  This theory hinges on what the State Defendants knew, when, and what they did in response.

### a.    Knowledge

The State Defendants argue that even if Plaintiff reported harassment to Barlow and Stander before October 2017, that knowledge cannot be imputed to them because Barlow and Stander were not "supervisors" for purposes of Title VII.  (Dkt. No. 147-2, at 13–14).  Plaintiff disagrees.  (Dkt. No. 165, at 19–20).  Notably, an employee need not be a supervisor to impute his or her knowledge to his or her employer.  As discussed above, there are several methods for imputation using the principles of agency.  Barlow and Stander testified that they were obligated

---

[5] Plaintiff also argues that Barlow and Stander were supervisors and helped "create the hostile working environment." (Dkt. No. 165, at 18–20).  However, Plaintiff does not identify any actions by Barlow and Stander *directed at her* that created the hostile work environment.  Rather, Plaintiff primarily refers to Barlow and Stander's inaction, i.e. that they did not report her complaints and remedy the situation.  But the strict liability rule for employers under Title VII contemplates that a supervisor abuses their position *by harassing* someone over whom they have power.  *See Vance*, 570 U.S. at 424, 428.  Thus, even assuming Barlow and Stander are supervisors, their inaction does not to rise to the level of *creating* a hostile work environment so as to hold the State Defendants responsible under Title VII.  To the extent Plaintiff suggests that Stander created the hostile work environment by engaging in "dry humping" with Dominie, she testified that she only witnessed one incident, where Stander was on the receiving end.  (Dkt. No. 143-12, at 43).  And although Plaintiff claims that she "overheard" sexually explicit conversations between the two, she could not recall any specific language used by Stander.  (*Id.* at 40, 67).  Accordingly, Stander's actions, on their own, could not be reasonably interpreted as creating a hostile work environment.

to report any instances of sexual harassment to the Affirmative Action Officer at OPWDD. (Dkt. No. 143-4, at 41–44; Dkt. No. 145-2, at 163). Because Barlow and Stander had an official duty to inform their employer of harassment, their knowledge of such conduct is imputable to OPWDD. *See Duch*, 588 F.3d at 763; *see also Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 64 (2d Cir. 1998) ("Angel's knowledge is also imputed to Perkin Elmer on an independent ground, namely that he had a responsibility to relay sexual harassment complaints to the company under the express policy promulgated by the company.").

As to what Barlow and Stander knew and when, the parties offer diverging accounts. Plaintiff testified that she reported every instance of Dominie's misconduct to Barlow, starting in in January 2017 when Dominie allegedly cupped Plaintiff's breast. (Dkt. No. 143-12, at 28, 37, 91–92). Barlow testified that Plaintiff did not report this incident to her. (Dkt. No. 143-4, at 197). Barlow testified that in early 2017, Plaintiff complained to her that Dominie had walked up behind her and "playful[ly]" pushed the back of her knee with his knee and grabbed her wrist. (*Id.* at 53–58). According to Barlow, Plaintiff did not report this incident as sexual harassment and she did not consider it as such. (*Id.* at 57–58). Plaintiff also testified that on different occasions in January of February of 2017, she reported to Barlow that Dominie had pushed her onto a couch and slapped her thigh. (Dkt. No. 143-12, at 30–33). Barlow testified that Plaintiff did not report these incidents. (Dkt. No. 143-4, at 200, 206). Plaintiff also testified that around July of 2017, she told Barlow that Dominie had lifted up her dress so he could see her underwear. (Dkt. No. 143-12, at 38). Barlow did not recall Plaintiff reporting these incidents. (Dkt. No. 143-4, at 207).

As to Stander, Plaintiff could not recall which incidents, if any, she reported to him. (Dkt. No. 143-12, at 67–68). Steve Cernac testified that in February of 2017, he reported to

Stander that Dominie had made crude sexual comments to Plaintiff and smacked her bottom. (Dkt. No. 160-5, at 151–56, 168). Stander testified that Cernac reported inappropriate language. (Dkt. No. 145-2, at 113). Stander also testified that he had no idea "things were going on" between Plaintiff and Dominie. (*Id.* at 154). Another female employee states that she told Stander in late 2016 to early 2017 that Dominie had groped her. (Dkt. No. 160-6, at 109).

Viewing these facts in the light most favorable to Plaintiff, a jury could reasonably find that, as of early 2017, Barlow knew that Dominie was subjecting Plaintiff to *ongoing hands-on sexual harassment*, thereby putting the State Defendants on notice.[6]

### b.    The Employer's Response

The undisputed facts show that the State Defendants did not discipline Dominie in any way until after the October 11, 2017 incident. Barlow testified that she did "informal" counseling several times with Dominie and told him that his behavior was unacceptable and to keep his hands off Plaintiff, and he would change his behavior for a while and then relapse. (Dkt. No. 143-4, at 60, 161). Stander also testified that he and Barlow met with Dominie in February of 2017 and told him that it was unacceptable to make inappropriate comments to Plaintiff. (Dkt. No. 145-2, at 124–27). And Plaintiff confirms that these meetings took place. (Dkt. No. 143-12, at 42, 67). But it is undisputed that Dominie's harassment of Plaintiff continued despite the attempts at informal counseling. Both Barlow and Stander also received a formal counseling memorandum regarding the October 11, 2017 incident, which stated that they waited several days to report it. (Dkt. No. 143-4, at 213–18; Dkt. No. 145-2, at 206–10, 218;

---

[6] In light of this ruling, the Court need not consider whether Stander's knowledge of one incident involving Dominie and Plaintiff, after having been allegedly notified of another woman's complaint regarding Dominie in late 2016 to early 2017, was enough to impute knowledge to the State Defendants.

Dkt. No. 160-4, at 197). And the Arbitrator found that "supervision should have acted sooner to control the inappropriate workplace conduct." (Dkt. No. 149-3, at 19–20).

Viewing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude that the State Defendants, despite having notice of Dominie's sexual harassment via Barlow as early as January 2017, failed to effectively and promptly address the situation to prevent continuing harassment that culminated in the October 11, 2017 incident. Therefore, the Court concludes Plaintiff has raised a material issue of fact as to whether the State Defendants were negligent in controlling workplace conditions and remedying the hostile work environment. Accordingly, the State Defendants' liability for Dominie's conduct under Title VII remains to be determined, and they are not entitled to summary judgment on Plaintiff's discriminatory hostile work environment claim. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (concluding that summary judgment was not appropriate where reasonable jurors could disagree as to whether the defendant's effort to remedy hostile work environment was effective and prompt).

### C.   Hostile Work Environment – NYSHRL – Defendants Barlow & Stander

Defendants Barlow and Stander argue that Plaintiff's NYSHRL discriminatory hostile work environment claims against them should be dismissed because Plaintiff has failed to show evidence that they participated in the hostile work environment or had discriminatory intent. (Dkt. No. 143-1, at 24–28; Dkt. No. 145-6, at 6–10). In response, Plaintiff contends that Defendants Barlow and Stander aided and abetted the hostile work environment created by Dominie and shared his discriminatory intent. (Dkt. No. 163, at 16–20; Dkt. No. 164, at 15–18).

#### 1.   Relevant Law

Under the NYSHRL, "an individual is properly subject to liability for discrimination when that individual qualifies as an 'employer,'" meaning that the individual "has an ownership

interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'"  *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 57 (2d Cir. 2012) (first quoting N.Y. Exec. Law § 296(1); then quoting *Patrowich v. Chem. Bank*, 63 N.Y.2d 541, 542 (1984) (per curiam)).  "A co-worker who 'lack[s] the authority to either hire or fire the plaintiff' may still be held liable as an aider-abettor under NYSHRL § 296(6) if he 'actually participates in the conduct giving rise to a discrimination claim.'"  *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 554–55 (S.D.N.Y. 2014) (quoting *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004)) (alteration in original).

In order to be liable under an aiding and abetting theory, "the aider and abettor [must] share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose."  *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020) (citations omitted).

### 2. Analysis

First, there is no dispute that Barlow and Stander lacked authority to hire and fire Plaintiff, and therefore, they can only be liable under NYSHRL to the extent they aided and abetted the conduct that created the hostile work environment.  Under this theory, the first question is whether Barlow and Stander actually participated in the hostile work environment. Plaintiff argues that they did so because they knew about Dominie's harassment of Plaintiff and failed to take appropriate remedial action.  (Dkt. No. 163, at 17; Dkt. No. 164, at 17).  Plaintiff also asserts that Stander "actively participated in the misconduct . . . by engaging in dry humping with Defendant Dominie, viewing/exchanging pornography with Defendant Dominie, and 'roughhousing.'"  (Dkt. No. 163, at 17).

As discussed above, Plaintiff has demonstrated evidence that Barlow knew about Dominie's ongoing sexual harassment and failed to take any appropriate action to remedy the

hostile work environment.  Notably, courts have found that such a failure to intervene can constitute actual participation in a hostile work environment for purposes of aiding and abetting liability.  *See Delisi v. Natl. Ass'n of Prof. Women, Inc.*, 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014) (citing cases).  Therefore, the Court finds Plaintiff has raised an issue of fact as to whether Barlow actually participated in the hostile work environment.  As to intent, direct evidence is rare and motive must often be inferred from circumstantial evidence.  *See Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006).  Viewing the evidence in the light most favorable to Plaintiff, Barlow repeatedly failed to stop Dominie's harassment and effectively condoned it.  This raises a question about her intent which is best left to a jury.  Accordingly, the Court finds that Defendant Barlow is not entitled to summary judgment on Plaintiff's NYSHRL hostile work environment claim.

As to Stander, there is conflicting evidence about whether he participated in the hostile work environment.  On one hand, the record shows that: 1) Stander was not Plaintiff or Dominie's direct supervisor; 2) Plaintiff could not recall which incidents she reported to him; and 3) Stander testified that he did not know that anything was going on between Plaintiff and Dominie.  (*See* Dkt. No. 143-12, at 67–68; Dkt. No. 145-2, at 113, 154; Dkt. No. 160-4, ¶ 9).  On the other hand, there is evidence that: 1) Cernac reported to Stander in February 2017 that he had witnessed an incident where Dominie directed sexually explicit language at Plaintiff and smacked her bottom; 2) Stander only reported this incident to Barlow; and 3) Stander had previously been informed by another female employee in late 2016 to early 2017 that Dominie had put his hand down her shirt and touched her breast.  (Dkt. No. 145-2, at 127; Dkt. No. 160-5, at 151–56; Dkt. No. 160-6, at 109).  Moreover, there is evidence that Stander was a willing participant in the "dry humping" activity with Dominie, and that he openly discussed and shared

pornography with Dominie in the office.  (Dkt. No. 143-12, at 43, 67; Dkt. No. 160-4, ¶¶ 32, 38; Dkt. No. 160-6, at 15–16).

Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably find that Stander knew about Dominie's sexual harassment, failed to stop it, and effectively encouraged it by his behavior.  Therefore, Plaintiff has raised an issue of fact as to whether Stander actually participated in and aided and abetted a hostile work environment.  Accordingly, the Court finds that Defendant Stander is not entitled to summary judgment on Plaintiff's NYSHRL hostile work environment claim.  *See Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 250 (W.D.N.Y. 2011) (denying individual defendants summary judgment on NYSHRL aiding and abetting hostile work environment claim, based on question of fact regarding "whether there were adequate measure[s] to combat the harassment").

### 3.   Qualified Immunity

Defendants Barlow and Stander also argue they are entitled to summary judgment on Plaintiff's NYSHRL claims because their actions involved discretionary functions protected by the doctrine of qualified immunity.  (Dkt. No. 143-1, at 27–28; Dkt. No. 145-6, at 10).  In response, Plaintiff contends that "the conduct at issue (i.e., failing to correct an overtly hostile work environment), was not discretionary in nature and qualified immunity does not attach." (Dkt. No. 163, at 28; Dkt. No. 164, at 26).

In general, "government officials or employees who make decisions that are discretionary, but not judicial in nature, are entitled to qualified immunity unless 'there is bad faith or the action is taken without a reasonable basis,' even where a claim is based on a violation of the NYSHRL." *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 200 (S.D.N.Y. 2004) (quoting *Hiller v. County of Suffolk*, 81 F. Supp. 2d 420, 424 (E.D.N.Y. 2000)).  "A discretionary decision or act involves the exercise of reasoned judgment which could typically produce

different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Id.* (internal quotation and citation omitted).

In this case, there are disputed material facts as to what Barlow and Stander did to address and/or contribute to the alleged hostile work environment. Notably, Plaintiff has adduced evidence that Barlow and Stander failed to stop Dominie's sexual harassment and thus aided and abetted the hostile work environment he created. Viewing the evidence in the light most favorable to Plaintiff, this failure to intervene could be seen as lacking any reasonable basis and even reflecting a discriminatory intent. Therefore, the Court finds that Defendants Barlow and Stander are not entitled to qualified immunity at this stage. *See Zagaja v. Vill. of Freeport*, 10-cv-3660, 2013 WL 2405440, at *16, 2013 U.S. Dist. LEXIS 79668, at *56 (E.D.N.Y. June 3, 2013) ("[G]iven the disputed issues of fact that exist as to whether [the defendant] personally discriminated against plaintiff, it would be inappropriate for the Court to grant [the defendant] qualified immunity with respect to plaintiff's . . . NYSHRL claims at this juncture.").

### D.   Hostile Work Environment – Section 1983 – Defendants Barlow & Stander

Defendants Barlow and Stander argue that Plaintiff's Section 1983 discriminatory hostile work environment claims against them are subject to summary judgment because Plaintiff cannot demonstrate their discriminatory intent or personal involvement in a constitutional deprivation. (Dkt. No. 143-1, at 19–24; Dkt. No. 145-6, at 14–15). In response, Plaintiff asserts that material questions of fact preclude summary judgment. (Dkt. No. 163, at 24–27; Dkt. No. 164, at 21–25).

### 1.   Relevant Law

Recovery under Section 1983 "is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or federal statutory right and, second, that such denial was effected under color of state law." *Patterson v. Coughlin*, 761 F.2d 886, 890 (2d Cir. 1985). As relevant here, "state and local officials can be held individually liable under 42 U.S.C. § 1983 for

violating the Equal Protection Clause of the Fourteenth Amendment by discriminatory acts against those who work under them." *Raspardo*, 770 F.3d at 113–14. "[T]he Equal Protection Clause protects such employees from sex-based workplace discrimination, including hostile work environments and disparate treatment." *Id.* at 114 (citing *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006)).

Unlike hostile work environment claims under Title VII , which hold the employer liable when misconduct in the workplace is so severe as to alter the terms and conditions of the plaintiff's employment, "[s]ection 1983 . . . applies by its terms only to individual 'persons' responsible for violating plaintiffs' rights." *Raspardo*, 770 F.3d at 115. Thus, "[i]n order to . . . 'establish individual liability under § 1983, a plaintiff must show . . . that the defendant caused the plaintiff to be deprived of a federal right.'" *Id.* (citing *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004)). "If a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." *Id.* (internal formatting omitted). In addition to personal involvement, a plaintiff pursuing a hostile work environment claim under Section 1983 must establish that the defendant's discriminatory intent was a "but-for" cause of the hostile environment. *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019).

### 2.    Analysis

As discussed above, Plaintiff has raised an issue of fact as to whether she was subject to a discriminatory hostile work environment. And that discrimination would constitute a violation of Plaintiff's right to equal protection under the law. It is also undisputed that Barlow and Stander were acting under color of state law as employees of New York State and OPWDD. As to personal involvement, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*." *Hernandez v. Keane*, 341 F.3d

137, 144 (2d Cir. 2003).  There is "no special rule for supervisory liability" and "a plaintiff must

plead and prove 'that each Government-official defendant, through the official's own individual

actions, has violated the Constitution.'"  *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020)

(quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).  As relevant here, it not enough to show

that Barlow and Stander were negligent or even grossly negligent in supervising Dominie;

Plaintiff must show that they acted with "deliberate indifference" to her constitutional rights.  *Id.*

at 619.

Viewing the facts in the light most favorable to Plaintiff, a jury could reasonably

conclude that Barlow and Stander knew about Dominie's ongoing harassment of Plaintiff, failed

to intervene, and allowed the situation to escalate, and thereby acted with deliberate indifference

to Plaintiff's constitutional rights.  This is enough to find Barlow and Stander's personal

involvement.  As discussed above, a reasonable jury could also infer that they had a

discriminatory intent.  However, it is undisputed that Dominie was the instigator of the

harassment directed at Plaintiff, and a jury could not reasonably conclude that Barlow or

Stander's deliberate indifference was the *but-for cause* of the hostile work environment.

Accordingly, Defendants Barlow and Stander are entitled to summary judgment on Plaintiff's

Section 1983 discriminatory hostile work environment claims.  *See Naumovski*, 934 F.3d at 222

(recognizing that negligent supervision could not be the but-for cause of hostile work

environment).

E.      **Discrimination – NYSHRL & Section 1983 – Defendants Barlow and Stander**

Defendants Barlow and Stander argue that Plaintiff's discrimination claims against them

are subject to summary judgment because Plaintiff has not shown evidence that they took any

adverse action against her.  (Dkt. No. 143-1, at 22, 28; Dkt. No. 145-6, at 15–16).  In response,

Plaintiff does not appear to assert any adverse actions taken by Barlow and Stander independent

of her hostile work environment and retaliation claims; instead she argues that they have failed to allege non-discriminatory reasons for their actions.  (Dkt. No. 163, at 23; Dkt. No. 164, at 21).

### 1.      Relevant Law

In general, claims of employment discrimination via NYSHRL and Section 1983 are analyzed under the *McDonnell Douglas* framework that governs such claims under Title VII.[7] *See Hill v. City of New York*, 136 F. Supp. 3d 304, 331 (E.D.N.Y. 2015).  Using this framework, the plaintiff must first establish a prima facie case of employment discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).  To establish a prima facie case, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination."  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).

If the Plaintiff establishes a prima facie case, the burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its actions.  *Hicks*, 509 U.S. at 506–07.  If the defendant carries that burden, the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

### 2.      Analysis

As the above framework indicates, it is Plaintiff's burden to establish a prima facie case of discrimination—which includes a showing that Defendants Barlow and Stander were personally involved in an adverse action against her.  Plaintiff has failed to make this showing.  Instead, she puts the burden on Defendants Barlow and Stander to show a non-discriminatory for

---

[7] Unlike Title VII, a plaintiff may bring a discrimination against an individual under NYSHRL and Section 1983.  *See Naumovski*, 934 F.3d at 212–13.  The Court notes that there are several other distinctions not relevant here.

their actions. But that would skip the necessary first step of the *McDonnell Douglas* framework, as the cases cited by Plaintiff make clear. In *Price v. Cushman & Wakefield, Inc.*, the court denied summary judgment on the plaintiff's discrimination claim where she "adduced evidence of adverse employment actions," and there were issues of fact as to whether discrimination was a factor in those actions. 808 F. Supp. 2d 670, 691 (S.D.N.Y. 2011). In *Wallen v. Teknavo Grp.*, the court partially denied summary judgment on the plaintiff's retaliation claim where he had adduced evidence of an adverse action and a causal connection to his protected activity, thus establishing a prima facie case, and the defendant failed to provide a non-retaliatory reason for the adverse action. No. 12-cv-6196, 2019 WL 1435879, at *23, 2019 U.S. Dist. LEXIS 55190, at *56–57 (E.D.N.Y. Mar. 30, 2019).

In sum, Plaintiff has failed to adduce evidence that Defendants Barlow and Stander were personally involved in an adverse action, and therefore she has not met her burden to establish a prima facie case of discrimination, and her NYSHRL and Section 1983 discrimination claims against Defendants Barlow and Stander must be dismissed.[8]

### F.    Retaliation – Title VII – State Defendants

The State Defendants argue that Plaintiff's Title VII retaliation claim against them is subject to summary judgment because Plaintiff cannot show that they took an adverse action against her based on her protected activity. (Dkt. No. 147-2, at 14–23, 25–26). In response, Plaintiff contends that she was subject to numerous acts of retaliation connected to her complaints of discrimination. (Dkt. No. 165, at 23–29).

---

[8] The Court has evaluated potential adverse actions below as part of Plaintiff's retaliation claim and concluded that each on its own would not dissuade a reasonable worker from making or supporting a charge of discrimination. It follows that these actions would not clear the higher bar for a discrimination claim of affecting the terms and conditions of employment. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006); *see also Roache v. Long Island R.R.*, 487 F. Supp. 3d 154, 171 (E.D.N.Y. 2020) (noting that supervisory inaction does not constitute an adverse employment action for purposes of a discrimination claim) (collecting cases).

### 1.      Relevant Law

Title VII states that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e–3(a).  Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 73–74 (2d Cir. 2015).

Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by showing evidence that: 1) she engaged in protected activity, 2) the defendant was aware of the activity; 3) the defendant took an adverse employment action against her; and 4) there is a causal connection between the protected activity and the adverse action.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).

If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action.  *Summa*, 708 F.3d at 129.  If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the employee to show "that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).

### 2.      Analysis

#### a.      Protected Activity

There is no dispute that Plaintiff engaged in protected activity when she filed a formal written complaint with OPWDD about Dominie's harassment on October 19, 2017 and later filed charges with the EEOC.  Plaintiff also argues that she engaged in protected activity when she

verbally reported Dominie's sexual harassment before October of 2017.  (Dkt. No. 165, at 25).

Plaintiff testified that she reported the harassment to Barlow several times from January to July

2017.  (Dkt. No. 143-12, at 28, 38, 67).  Viewing the facts in the light most favorable to Plaintiff,

these informal reports could also be reasonably interpreted as protected activity.

### b.      Adverse Actions

Generally, "an adverse employment action is any action that 'could well dissuade a

reasonable worker from making or supporting a charge of discrimination.'"  *Vega v. Hempstead*

*Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington Northern*, 548 U.S. at

57).  "This definition covers a broader range of conduct than does the adverse-action standard for

claims of discrimination under Title VII: '[T]he antiretaliation provision, unlike the substantive

[discrimination] provision, is not limited to discriminatory actions that affect the terms and

conditions of employment.'"  *Id.* (quoting *Burlington Northern*, 548 U.S. at 64) (alterations in

original).  The Supreme Court has explained that it has:

> phrase[d] the standard in general terms because the significance of any
> given act of retaliation will often depend upon the particular circumstances.
> Context matters. "The real social impact of workplace behavior often
> depends on a constellation of surrounding circumstances, expectations, and
> relationships which are not fully captured by a simple recitation of the
> words used or the physical acts performed."

*Burlington Northern*, 548 U.S. at 69 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523

U.S. 75, 81–82, (1998)).  To determine "whether conduct amounts to an adverse employment

action, the alleged acts of retaliation need to be considered both separately and in the aggregate,

as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."

*Hicks*, 593 F.3d at 165 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir.

2006)).

Here, Plaintiff asserts that her retaliation claim incorporates two theories: 1) that each alleged instance of retaliation is an adverse action; and 2) that all of the instances of retaliation add up to an adverse action.  (Dkt. No. 165, at 25).  According to Plaintiff, after she first reported Dominie's harassment, she then suffered various acts of retaliation including: 1) Dominie put a fake rat on her desk in February or March of 2017 and called her a "rat" and a "nark"; 2) Barlow and Stander failed to stop Dominie's behavior; 3) Barlow and Stander belatedly signed her timecards from November 2017 onwards; 4) Stander failed to include her on important emails; 5) Barlow and Stander spread false rumors about her having an affair with Dominie; 6) OPWDD delayed posting a position she wanted in the spring of 2018; 7) she was threatened with discipline for speaking about her sexual harassment complaint; 8) OPWDD terminated her sister's employment in June of 2019; 9) Barlow sat behind Plaintiff at a meeting in the fall of 2018; 10) OPWDD subjected Plaintiff to a "sham interrogation" in February of 2019; 11) she was required to participate in the disciplinary action against Dominie in the spring of 2018; and 12) she was threatened with termination if she did not testify.  (Dkt. No. 165, at 26–29) (citing Dkt. No. 160-4, ¶ 99–163).

### i.    Individual Acts

As an initial matter, the incidents alleged by Plaintiff, even if true, do not independently amount to adverse actions.  It is well-established that "petty slights or minor annoyances that often take place at work" do not amount to actionable retaliation.  *Burlington Northern*, 548 U.S. at 68.  Falling into this category are Plaintiff's allegations about being left off emails, being the subject of rumors, and having Barlow sit behind her at a meeting.[9]  Further, even if Barlow or

---

[9] The Court also notes that Plaintiff has not adduced any admissible, non-hearsay evidence that Barlow or Stander spread rumors about her.  (*See, e.g.*, Dkt. No. 160-4, ¶ 134) (claiming that a nursing supervisor informed her that "Agency management had [said] I was having an affair with Dominie").

Stander delayed signing Plaintiff's timecards, there is no evidence that she missed a paycheck; indeed the record shows that Plaintiff received her regular pay on time but on some occasions received her overtime pay up to two months later.  (*See* Dkt. No. 147-18, at 12–16).  Notably, courts have held that a delayed paycheck does not rise to the level of an adverse action for a retaliation claim, and the same goes for the delayed overtime here.  *See Jones v. New York City Bd. of Educ.*, No. 09-cv-4815, 2012 WL 1116906, at *14, 2012 U.S. Dist. LEXIS 47128, at *38 (S.D.N.Y. Apr. 2, 2012) ("A mere delay in receiving a paycheck is not an adverse employment action sufficient to state a claim of retaliation.").

Similarly, negative comments directed at Plaintiff by Dominie (and the fake rat allegedly placed on her desk) do not amount to an adverse action because: 1) Plaintiff states that it only occurred once in February/March 2017 (*see* Dkt. No. 160-4, ¶ 45); and 2) Dominie was only Plaintiff's co-worker, with no power to take any official action against her.  Thus, a reasonable person in Plaintiff's position would not be dissuaded from reporting his behavior.  *See Kelly v. New York State Off. of Mental Health*, 200 F. Supp. 3d 378, 407 (E.D.N.Y. 2016) ("The sporadic comments allegedly directed at plaintiff, while perhaps mean-spirited and offensive, would not dissuade a reasonable person from exercising their rights.").  Indeed, Plaintiff indicates that she continued to report Dominie's behavior several times thereafter.  (*See* Dkt. No. 143-12, at 38; Dkt. No. 160-4, ¶ 54).

Plaintiff also claims that in February 2019 she was subjected to a "sham" interrogation about an issue she was not involved in, which she viewed as retaliatory because the investigator was a friend of Dominie.  (Dkt. No. 160-4, ¶ 119).  But Plaintiff states that the investigator was changed at her request, (*id.* ¶ 120), and Plaintiff does not provide any further evidence or explanation about the interrogation so as to suggest it would have dissuaded a reasonable person

42

from making or supporting a charge of discrimination.  Likewise, the fact that Plaintiff was required to participate in the disciplinary hearing against Dominie could not be reasonably viewed as retaliatory, in as much as Plaintiff was the complaining witness upon whom the case against Dominie depended.  (*See* Dkt. No. 149-3; Dkt. No. 149-6, at 2–7).

Further, Plaintiff asserts that she suffered an adverse action when OPWDD prevented her from competing for a different job.  (Dkt. No. 165, at 29).  Plaintiff avers that OPWDD delayed in posting the job for several months in the spring of 2018 because they did not want her to get it.  (Dkt. No. 160-4, ¶¶ 112–13).  But the record shows that the job was posted in August of 2018, and Plaintiff was selected for it and started in October of 2018.  (*See* Dkt. No. 147-18, at 17).  Even viewing the facts in the light most favorable to Plaintiff, a short delay in posting a job is not the sort of materially adverse action that would dissuade a reasonable person from making or supporting a charge of discrimination.

Plaintiff also claims that her sister, Marcia Marcotte, was terminated in response to Plaintiff's complaints.  (Dkt. No. 160-4, ¶¶ 161–63).  This incident, if true, might be interpreted as a threat that Plaintiff's employment could be terminated.  And Plaintiff has also claimed that at different times she was threatened with discipline and termination.  (*Id.* ¶¶ 110, 126).  However, courts have held that "threats of termination or other punishment do not qualify as adverse actions [for a retaliation claim] where they were never carried through."  *Turley*, 803 F. Supp. at 254; *see also Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011) (finding that verbal threats of termination that were not carried out did not constitute adverse actions for retaliation claim).  Thus, neither the termination of Ms. Marcotte nor the threats made to Plaintiff rises to the level of an adverse action.

### ii.     Aggregate

As discussed above, alleged acts of retaliation must be considered separately and in the aggregate, with attention paid to their context.  *See Burlington Northern*, 548 U.S. at 69. Although the alleged acts of retaliation in this case might seem relatively minor on their own, considering the acts altogether, and viewing them in the light most favorable to the Plaintiff, they could be seen as stifling protected activity.  Thus, the Court cannot find that as a matter of law that the retaliatory incidents alleged by Plaintiff do not add up to an adverse action that might dissuade a reasonable work from making or supporting a charge of discrimination.  *See Vega*, 801 F.3d at 92 ("Some of these actions, considered individually, might not amount to much. Taken together, however, they plausibly paint a mosaic of retaliation and an intent to punish Vega for complaining of discrimination."); *see also Cusher v. Mallick*, No. 16-cv-1273, 2020 WL 109510, at *28, 2020 U.S. Dist. LEXIS 3411, at *83  (N.D.N.Y. Jan. 9, 2020) ("Taken together, the Court finds that the unit inspections, excessive scrutiny, and office change to an inferior room could deter a similarly situated individual of ordinary firmness from exercising his . . . rights.") (internal quotation marks and citations omitted).

### iii.     Hostile Work Environment

The State Defendants also argue that the retaliatory incidents alleged by Plaintiff were not so continuous and concerted in the aggregate as to "alter the conditions of Plaintiff's working environment."  (Dkt. No. 147-2, at 26).  In response, Plaintiff suggests that the incidents add up to a retaliatory hostile work environment.  (Dkt. No. 165, at 24).  While Plaintiff appears to conflate the two, a retaliatory hostile work environment is not the same as the aggregate of retaliatory acts.  Rather, a plaintiff attempting to show an adverse action in the form of a retaliatory hostile work environment must satisfy "the same standard that is applied generally to hostile work environment claims regarding the severity of the alleged conduct."  *Grimes-Jenkins*

*v. Consol. Edison Co. of N.Y., Inc.*, No. 16-cv-4897, 2021 WL 1226658, at \*10, 2021 U.S. Dist. LEXIS 62975, at \*30–31 (S.D.N.Y. Mar. 31, 2021).  Thus, Plaintiff must show that the retaliatory acts were severe or pervasive enough that a reasonable person in her position would find the environment to be hostile or abusive, and the conditions of her employment altered.

As discussed above, Plaintiff has adduced evidence that over the course of several years, she experienced about a dozen potentially retaliatory incidents.  But even viewing the facts in the light most favorable to Plaintiff, a jury could not reasonably find that these incidents were either severe or pervasive enough to produce a retaliatory hostile work environment.  Therefore, Plaintiff cannot sustain her retaliation claim on this theory.

### c.  Causal Connection

Next, Plaintiff must show that there is a causal connection between her protected activity and the adverse action she experienced (in this case the aggregate of incidents).  As discussed above, there is evidence to reasonably find that Plaintiff engaged in protected activity in January 2017, July 2017, October 2017, August 2018, and August 2019.  And Plaintiff has adduced evidence of potentially retaliatory incidents throughout this period that could be seen as temporally linked to her complaints of discrimination.  Therefore, given the *de minimis* burden at the prima facie stage, the Court finds that Plaintiff has raised an issue of fact as to causation.  It follows that Plaintiff has established a prima facie case of retaliation and the burden shifts to the State Defendants.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) (recognizing that "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VI").

### d.  Legitimate, Non-Retaliatory Reasons

The State Defendants argue that there were valid reasons for all of the retaliatory incidents alleged by Plaintiff.  (Dkt. No. 147-2, at 20–23).  For example, the State Defendants

cite an affidavit from David Albano, a Human Resources Specialist at OPWDD, who states that:
1) Plaintiff's testimony was needed at the disciplinary hearing; 2) he had the authority to
discipline her if she did not cooperate; and 3) he recommended the termination of Ms. Marcotte's
probationary employment based on a substantiated allegation that she neglected a patient by
dozing off while on duty.  (Dkt. No. 147-5, ¶¶ 7–14).  The State Defendants have also submitted
an OPWDD investigation report which, among other things, states that: 1) Plaintiff submitted
some timecards late and others that were approved late involved overtime that needed to be
verified by supervisors; 2) Plaintiff was told not to discuss her complaint because it could
interfere with the Dominie investigation; 3) the posting of the job Plaintiff wanted was a
"business decision" and followed a "normal timeline"; and 4) Plaintiff was left off an email
when Stander did not select "reply all."  (Dkt. No. 147-16).  Based on this evidence, the Court
finds that the State Defendants have shown legitimate, non-retaliatory reasons for the retaliatory
acts alleged by Plaintiff.

###### e.    But-For Causation

Finally, the State Defendants contend that Plaintiff cannot show but-for causation
between her protected activity and the alleged acts of retaliation.  (Dkt. No. 147-2, at 20–23).  In
response, Plaintiff argues that a reasonable jury could find that Defendants had retaliatory intent.
(Dkt. No. 165, at 28–29).  But at this stage, Plaintiff must adduce evidence to show that the
desire to retaliate was the *but-for cause* of the challenged action.  Given the aggregate nature of
Plaintiff's claim, she must logically show but-for causation for each action.

Plaintiff only addresses but-for causation as it relates to one action.  She contends that a
"a reasonable jury will find that 'but for' Tromblee's protected activity Marcotte would not have
been fired."  (Dkt. No. 165, at 27).  Plaintiff claims that causation is shown by the timing
between the protected activity and the adverse action, and "the fact that Dominie had been

written up many times before for sleeping and was never fired." (*Id.*). However, it is well-established that temporal proximity on its own is not enough to show but-for causation. *See Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x 88, 94 (2d Cir. 2014). It is also worth noting that unlike Dominie, Ms. Marcotte was charged with caring for patients, making it much more serious if she dozed off.

Regardless, any causal connection between Plaintiff's protected activity and the termination of Ms. Marcotte's employment is effectively severed by undisputed evidence that Mr. Albano, who made the termination decision, had no knowledge at the time that Ms. Marcotte was related to Plaintiff. (*See* Dkt. No. 147-5, ¶¶ 13–16). Further, Mr. Albano's decision was based on an investigation by the Justice Center for the Protection of People with Special Needs, which substantiated the allegation that Ms. Marcotte fell asleep on the job.[10] (*See* Dkt. No. 147-11). To the extent Plaintiff suggests that Mr. Albano nonetheless acted with a retaliatory motive, she cannot create an issue of fact based purely on speculation. *See Hicks*, 593 F.3d at 167 (noting that "a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove").

---

[10] Plaintiff claims that the State Defendants failed to produce during discovery documents relating to Ms. Marcotte's termination; that Mr. Albano was not identified as a witness relevant to the termination; and that the State Defendants failed to comply with the Court's Order directing them to explain how they searched for information to verify their discovery responses. (Dkt. No. 165, at 7–8). Plaintiff requests an adverse inference against the State Defendants finding that "Ms. Marcotte's employment was terminated as a retaliatory act against Plaintiff because of her opposition to discrimination and retaliation under Title VII." (*Id.* at 8–9). The State Defendants do not appear to respond to this argument. While the Court does not sanction the State Defendants' conduct here, the Court does note that the State Defendants produced documents regarding Ms. Marcotte's termination in their motion for summary judgment, (Dkt. Nos. 147-5, 147-11 and 147-12), and Plaintiff did not seek to conduct additional discovery based on these documents. *See* Fed. R. Civ. P. 56(d)(2). Generally speaking, if a party fails to comply with an order to provide discovery, the Court may impose various sanctions including an adverse inference. Fed. R. Civ. P. 37(b)(2)(A). However, even assuming the State Defendants violated a discovery order and failed to produce the documents they now rely upon to explain Ms. Marcotte's termination, Plaintiff has not demonstrated how it would have made a difference to her case if she had the documents earlier, i.e. how she could refute Mr. Albano's affidavit and the Justice Center investigation. Moreover, the adverse inference requested by Plaintiff is not just a finding of fact but effectively a legal conclusion. Based on the lack of showing of prejudice to Plaintiff, the fact that documents have now been produced, and the windfall nature of the finding sought by Plaintiff, the Court concludes that an adverse inference is not warranted.

Plaintiff also attempts to poke some holes in the reasons cited by the State Defendants for several other actions.  (Dkt. No. 165, at 26–29).  But it is not enough to show that the State Defendants' reasons are inaccurate or even false, as the key question remains what *motivated* the challenged actions.  *See McPherson v. N.Y. City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).  And beyond temporal proximity and her self-serving testimony, Plaintiff has offered no evidence that the actions would not have occurred in the absence of a retaliatory motive.  In sum, Plaintiff has not adduced evidence to support a reasonable finding of but-for causation between her protected activity and the acts that comprise her aggregate retaliation claim.  Accordingly, the State Defendants are entitled to summary judgment on Plaintiff's Title VII retaliation claim. *See Colton v. N.Y. Div. of State Police*, No. 14-cv-801, 2017 WL 5508911, at *19, 2017 U.S. Dist. LEXIS 220766, at *49 (N.D.N.Y. Feb. 8, 2017) (finding that the plaintiff's "conclusory contentions" were "insufficient to satisfy her burden of demonstrating that her protected activity was a but-for cause" of the challenged employer actions).

### G.      Retaliation – NYSHRL & Section 1983 – Defendants Barlow & Stander

Defendants Barlow and Stander argue that Plaintiff's retaliation claims against them must fail because there is no evidence that they took any adverse employment action against Plaintiff. (Dkt. No. 143-1, at 14; Dkt. No. 145-6, at 10–14).  In response, Plaintiff contends that Barlow and Stander retaliated against her and also aided and abetted retaliation.  (Dkt. No. 163, at 12–13, 20–23; Dkt. No. 164, at 12 –13, 18–20).  However, as discussed above, Plaintiff has not raised an issue of fact that retaliation took place.  Therefore, Defendants Barlow and Stander could neither have committed retaliation nor aided and abetted it, and Plaintiff's related claims against them must fail.

### H.        Constructive Discharge – Title VII – State Defendants

The State Defendants argue that Plaintiff cannot establish the elements of a constructive

discharge claim.  (Dkt. No. 147-2, at 26).  In response, Plaintiff suggests that "[a] reasonable jury

could find that the cumulative effect of the conditions alleged by plaintiff created a working

environment so intolerable that a reasonable person would be forced to resign from her job."

(Dkt. No. 165, at 30).

### 1.        Relevant Law

"The constructive-discharge doctrine contemplates a situation in which an employer

discriminates against an employee to the point such that his 'working conditions become so

intolerable that a reasonable person in the employee's position would have felt compelled to

resign.'"  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citing *Pennsylvania State Police v.*

*Suders*, 542 U.S. 129, 141 (2004)).  "When the employee resigns in the face of such

circumstances, Title VII treats that resignation as tantamount to an actual discharge."  *Id.*

To establish constructive discharge, the employee must show: 1) "that there is evidence

of the employer's intent to create an intolerable environment that forces the employee to resign"

and 2) "that the evidence shows that a reasonable person would have found the work conditions

so intolerable that he would have felt compelled to resign."  *Schultz v. Congregation Shearith*

*Isreal of the City of N.Y.*, 867 F.3d 298, 308 (2d Cir. 2017) (quoting *Adams v. Festival Fun*

*Parks, LLC*, 560 F. App'x 47, 49 (2d Cir. 2014)).  Notably, courts have recognized that while a

constructive discharge claim is often premised on the same conduct underlying a hostile work

environment claim, the standard for constructive discharge is higher.  *See Bader v. Special.*

*Metals Corp.*, 985 F. Supp. 2d 291, 309 (N.D.N.Y. 2013).

### 2.      Analysis

Plaintiff claims that she was constructively terminated when she was forced to retire prematurely due to the hostile work environment and retaliation she experienced at OPWDD. (Dkt. No. 165, at 30).  The record shows that Plaintiff applied for retirement on or about October 13, 2020, and she left employment with the State and OPWDD on or about November 30, 2020. (Dkt. No. 147-1, ¶¶ 30–31).  Thus, Plaintiff retired approximately three years after Dominie was suspended for sexually harassing her.  Although Plaintiff states that she feared Dominie's return, she testified that she had no contact with him after October 18, 2017, with the exception of the arbitration.  (Dkt. No. 143-12, at 60).  Based on this evidence, a reasonable jury would have to find that the discriminatory hostile work environment created by Dominie ceased to exist in October 2017.  And the evidence does not support a reasonable finding that there was a retaliatory hostile work environment, as discussed above.

Therefore, even viewing the facts in the light most favorable to Plaintiff, a reasonable person in her position in the fall of 2020 could not have found the work conditions at OPWDD so intolerable that they felt compelled to resign.  Accordingly, the State Defendants are entitled to summary judgment on Plaintiff's Title VII constructive discharge claim.  *See Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 411 (2d Cir. 2011) ("no reasonable jury could conclude that a reasonable person would feel compelled to quit his job over conduct that had ceased years earlier").

### V.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant Barlow's motion for summary judgment (Dkt. No. 143) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Defendant Stander's motion for summary judgment (Dkt. No. 145) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that the State Defendants' motion for summary judgment (Dkt. No. 147) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's motion for partial summary judgment (Dkt. No. 149) is **DENIED**; and it is further

**ORDERED** that Plaintiff's claim for gender discrimination based on disparate treatment in violation of Title VII, as against Defendants New York State and OPWDD, is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's claim for retaliation in violation of Title VII, as against Defendants New York State and OPWDD, is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's claim for constructive discharge in violation of Title VII, as against Defendants New York State and OPWDD, is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's Section 1983 hostile work environment claim against Defendant Barlow is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's NYSHRL and Section 1983 discrimination and retaliation claims against Defendant Barlow are **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's Section 1983 hostile work environment claim against Defendant Stander is **DISMISSED with prejudice**; and it is further

**ORDERED** that Plaintiff's NYSHRL and Section 1983 discrimination and retaliation claims against Defendant Stander are **DISMISSED with prejudice**; and it is further

**ORDERED** that the following claims shall proceed to trial: 1) Plaintiff's Title VII discriminatory hostile work environment claim as against Defendants New York State and OPWDD; 2) Plaintiff's NYSHRL claims against Defendants Barlow and Stander for aiding and abetting a discriminatory hostile work environment; and 3) Plaintiff's claims against Defendant Dominie.

**IT IS SO ORDERED.**

Dated: <u>March 27, 2023</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge